2010 OK CR 5

Phillip Anthony SUMMERS, Appellant

v.

STATE of Oklahoma, Appellee.

No. D–2008–313.

Court of Criminal Appeals of Oklahoma.

Feb. 25, 2010.

Robert Stubblefield, Mark Matheson, Attorneys at Law, Tulsa, OK, attorneys for defendant at trial.

Tim Harris, District Attorney for Tulsa County, Steve Kunzweiler, Assistant District Attorney for Tulsa County, Tulsa, OK, attorneys for the State at trial.

James L. Hankins, Ogle Law Office, P.L.L.C., Oklahoma City, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer J. Dickson, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## *OPINION*

CHAPEL, Judge.

¶ 1 Phillip Anthony Summers was tried by jury and convicted of two counts of First-Degree Malice Aforethought Murder, in violation of 21 O.S.2001, § 701.7(A), in the District Court of Tulsa County, Case No. CF–2004–2056 (Counts I and II). In the sentencing phase, the jury recommended a sentence of death for both murders, after finding the following three aggravating circumstances in relation to both: 1) that Summers was previously "convicted of a felony involving the use or threat of violence"; (2) that Summers "knowingly created a great risk of death to more than one person"; and 3) that there was a "probability" that Summers would "commit criminal acts of violence that would constitute a continuing threat to society." [1] In accordance with the jury's recommendation, the trial court, the Honorable P. Thomas Thornbrugh, sentenced Summers to death on both counts. Summers has perfected this direct appeal of his convictions and sentences.[2]

### FACTS

¶ 2 During the early evening hours of February 23, 2004, Ples and Shelly Vann were eating dinner and watching television in their Tulsa home, at 38 East 50th Place North, when at least two armed persons entered their home and shot them both to death. Ples Vann was found lying on the floor in the living room, just inside the front door, with a paper towel in his left hand and a piece of pork chop bone in his right hand. Shelly Vann was found on the floor about 15 feet away, partially under the dining table. She too had a paper towel in her left hand. The television was on, but the volume was muted, and a television remote control was found on the floor near Shelly Vann's right hand.

¶ 3 According to the medical examiner, both Ples and Shelly Vann died as a result of multiple gunshot wounds. Ples Vann had three gunshot wounds, *i.e.*, he was hit by three different bullets. He was shot once in the face, on the right side of his nose, by a bullet that grazed the underside of his brain and exited behind his left ear.[3] He was also shot through his upper right arm, by a bullet that then entered the right side of his chest, passed through his lungs and also his pulmonary artery, and exited out his upper left back.[4] Ples was also shot in the right thigh,

---

1. *See* 21 O.S.2001, § 701.12(1), (2) and (7), respectively.

2. Summers filed his Petition in Error on September 12, 2008. On April 13, 2009, Summers filed his Brief. On this same date, Summers tendered for filing a "Motion of the Appellant to Supplement the Record on Appeal and for Evidentiary Hearing on his Claim of Ineffective Assistance of Counsel." This motion is hereby **ACCEPTED FOR FILING.** Summers' motion for an evidentiary hearing, however, is **DENIED,** for the reasons discussed *infra*. On August 10, 2009, the State filed its Brief. On September 15, 2009, Summers tendered a Reply Brief, which was accepted for filing on September 17, 2009. Oral argument before this Court was held on December 15, 2009.

3. The medical examiner testified that this shot alone would have caused the victim to collapse virtually immediately and to die within a few minutes.

4. The medical examiner testified that the direction of this bullet was right to left and somewhat upward, exiting the body approximately 4 inches above the entrance wound.

by a bullet that went through his right thigh and then entered the inner part of his left thigh and lodged there.[5] In addition, a bullet was found inside his white shirt, next to his skin.[6]

¶ 4 Shelly Vann also had three gunshot wounds. She was shot once in the right upper chest, by a bullet that passed through her right lung and came to rest under the skin of her back, near the left side of her spine.[7] She was also shot on the right side of her back, by a bullet that passed through both lungs, exited through the left side of her chest, and then went through her left arm before exiting again.[8] Shelly Vann was also shot through her right upper arm, from back to front.[9]

¶ 5 The medical examiner noted that he did not observe soot or stippling around any of the wounds on either victim, which indicated that the shots were fired from a distance greater than two or three feet away. A .45 caliber bullet was recovered from underneath the carpet directly below where Shelly Vann was found, which suggested that she had been shot at least once when she was already down.[10] In addition, nine cartridge casings ("casings") were found in the home, seven Wolf .45 auto casings and two CBC .380 auto casings.

¶ 6 Ples Vann was employed by the David L. Moss Center, *i.e.*, the Tulsa County jail, and Shelly Vann was a homemaker. The Vanns had three sons: Donald Tennyson, Quantee Tennyson, and Lawrence ("Bud") Tennyson.[11] Quantee testified that he had eaten a pork-chop dinner with his parents at around 4:00 or 5:00 p.m. that day.[12] He left afterwards and later got a phone call from his younger brother, Bud, asking for a ride home so that Bud could get dinner. Quantee, along with Lakisha Harris, picked up Bud and then a woman Bud was dating, "Tiffany," later that evening. Quantee dropped off Bud and Tiffany and was about to drive away when Bud came running out of the home screaming that their mother and father had been shot and were dead.

¶ 7 A neighbor and friend of the Vanns, Kenneth Norman, testified that he was in his home watching television the night of February 23, 2004, when he heard as many as 10 or 12 gunshots, at around 7:00 or 7:30 p.m. Norman testified that he rolled off his couch and hit the floor, since he did not know where the shots were coming from. He stayed on the floor for three or four minutes, listening for a car speeding away, but did not hear anything. He then got up, went to his

5. This bullet was identified at trial as a .380 or possibly a 9mm, which have the same diameter. The medical examiner testified that the direction of this bullet was right to left and upward and that it lodged approximately 9 inches above the spot where it first entered the right leg, which was consistent with the victim being in a reclined or lying down position.

6. Although this bullet was State's Exhibit 59 at trial, the trial record does not contain any testimony actually identifying what kind of bullet it is; nor was it ever compared to the weapons eventually recovered in connection with the case.

7. This bullet was identified at trial as a .45 auto bullet.

8. The medical examiner testified that both of these injuries, especially the second, would have caused extensive bleeding and unconsciousness within a few minutes.

9. This wound would not have been a significant factor in the victim's death.

10. Although this bullet was State's Exhibit 60 at trial, the record does not contain any testimony actually identifying what kind of bullet it is; nor was it ever compared to the weapons eventually recovered in connection with the case.

11. Budd Tennyson testified that although Ples Vann was technically their stepfather, he had raised the three boys since Budd was 3 years old; and Quantee and Budd consistently referred to Ples Vann as "daddy" or "my father" during their testimony. Budd, who was 21 years old at the time, still lived in the Vann home; Quantee, who was 23, did not, though he came by daily. Budd testified that the oldest brother, Donald, died of a seizure shortly after their parents were killed.

12. Quantee testified that he had a felony conviction in 2000 for possession of crack cocaine, for which he was sentenced to 5 years of probation. At trial Quantee adamantly denied any affiliation or association with the Neighborhood Crips gang, although at one point he acknowledged "being around them." Other witnesses described Quantee as an active member of that gang. Quantee also denied any knowledge that his brother Bud was a gang member.

own front door, and looked over at the Vann home, since there had been previous drive-by shootings there. Norman testified that the Vanns' front door was open, though the screen door was closed, and that he watched for a while to see if Ples or Shelly would come to the door. When no one appeared at the door, Norman assumed everything was fine and went back to watching television.[13] Norman testified that he did not hear or see anything else unusual that night, until he later heard Quantee out in the street crying, "They killed my mama and daddy."

¶ 8 Bud testified that he talked to his mother around 6:00 or 7:00 p.m. that night about coming home to eat and then called Quantee asking for a ride.[14] Bud testified that they arrived at the home of his parents around 10:30 or 11:00 p.m. and that the outside screen door was shut, but the main front door behind it was wide open. When he entered, he immediately saw his father lying rolled over on the floor, in front of the loveseat, which was in the living room very near the front door. At first Bud thought Ples had fallen asleep and rolled off the couch. He discovered that his father was dead and bloody when he bent down to help him up. Bud then looked around and saw that his mother was also lying dead on the floor across the room, in the area between the living room and the adjacent dining area. Bud ran out to tell Quantee what he had discovered.

¶ 9 Bud (and Tiffany) then got back in Quantee's car, not sure what to do next. They drove around a bit and then went to the home of their neighbor, Kenneth Norman, to see if he had a gun. Bud testified that he wanted to get a gun in case someone was still in the home and that he did not even consider calling the police, because he "did not like being around the police," since he was a member of the Neighborhood Crips gang.[15] Bud testified, "I figured I could handle my own business," and that within the gang culture this kind of thing would be handled "on the street." Norman did not provide a gun, but Bud and Quantee decided to return home anyway.[16] Bud testified that when they got back home, he searched his parents' bedroom looking for his father's gun—while his brother and the girls were in the living room crying—but he was unable to find it.[17] At some point Lakisha Harris called "911." [18]

¶ 10 Bud testified that he immediately assumed that the killing of his parents was related to an ongoing, violent feud between his gang, the Neighborhood Crips, and a rival gang, the Hoover Crips.[19] In fact, Bud,

13. There was conflicting testimony at trial regarding whether the Vanns would or would not regularly leave their front door open or unlocked. Norman testified that when he looked over at the Vann home, "I seen the front door still open like it was" when he had started watching t.v. Norman also testified that he and Ples would sometimes leave their front doors open, so that when someone would come up, they could see who it was. Budd testified that his parents would not open their door to someone that they didn't know, yet he also testified that despite the violence in the neighborhood, "My mama and daddy weren't really scared or nothing.... [T]hey weren't gonna let nobody run them from their home." Quantee testified that the doors in the Vann home were always closed and locked and that the front doors were both closed when he arrived to drop off Bud that night.

14. Bud testified in orange prison garb and acknowledged that he was serving a 5-year federal sentence somewhere in Texas, after having been convicted of being a felon in possession of a firearm in furtherance of drug trafficking.

15. Quantee also testified that he never considered calling for an ambulance or the police.

16. Norman likewise testified that Bud and Quantee came to his home looking for a gun, that he did not give them one, and that he advised them not to return to the home. Norman also testified that Bud kept saying, "I'm gonna get 'em. I'm gonna get 'em."

17. Bud testified that he "was planning on using it" and "wanted to murder somebody," even though he didn't know who was responsible at the time. Tulsa police investigating the scene later that night recovered a .38 Smith & Wesson revolver under the Vanns' bedroom mattress.

18. Bud testified that he left before the police and emergency crews arrived.

19. Even at trial Bud referred to members of the Hoover gang as "nobody really" and "wanna be gangsters." Bud described numerous shootouts between the Hoovers and the Neighborhoods and testified that he personally had been shot at 10–12 times by Hoover gang members and that several times he had shot back.

Quantee, and other witnesses all testified that the Vann home had been shot at in multiple drive-by shootings prior to the murders of Ples and Shelly Vann.[20] Bud also testified that he was a "fairly high ranking member" of the Neighborhood gang and that various members of the Hoovers held him responsible for acts of violence committed against Hoovers.[21] Officer William Ellis, who was the Tulsa police sergeant in charge of the organized gang unit at the time, testified about how the two gangs operated and could be recognized, common gang terms and practices, subsets of the gangs, and about the very violent rivalry between the Hoovers and the Neighborhoods at the time.[22]

¶ 11 On February 25, 2004, two days after the Vann homicides, a tip came in to Tulsa police about a group of men in a black Ford Focus in North Tulsa, who were armed and possibly intending some kind of gang violence. Officer Timothy Ward was on duty in the Tulsa Police Department's helicopter unit that night.[23] Some time after 11:00 p.m. that night, Ward spotted a vehicle that appeared to match the description of the tip. Ward explained that the helicopter was equipped with a "Night Sun," a 30–million, candle-power spotlight, which he shined on the car. After he did so, the car began speeding and driving erratically; so Ward alerted officers on the ground. The helicopter was also equipped with FLIR night-vision equipment, which detects heat and allows the viewer to see black-and-white images of things on the ground that produce heat.[24] Ward used the FLIR to track the movements of the car and its occupants. The car turned into a residential area in North Tulsa, stopped in someone's yard, near Main and Zion Street, and four persons bailed out of the car and ran. Ward continued to track the movements of these persons as best he could, using both the Night Sun and the FLIR, and communicated these movements to officers on the ground until all four men were apprehended shortly after midnight, within a few blocks of where the black Ford Focus was abandoned.[25]

¶ 12 Roy Summers (brother of defendant Phillip Summers) and Gregory McKinney were apprehended together and first that night, followed by Robert Fellows and then Phillip Summers.[26] Since no guns, drugs, or illegal items were found either in the car or on any of the men, and none had any outstanding warrants, they were all four released at the scene.[27] Later that night, however, Tulsa police officers who were searching the area for evidence, with a dog from their K–9 unit, found a plastic baggie containing seven live rounds of Winchester .45 ammunition, which was tucked in a wide area of a tree trunk at 2400 North Main in Tulsa, within a few blocks of where the four suspects were apprehended.[28]

**20.** Bud testified that the home of his parents had been shot at 9 or 10 times.

**21.** At trial Bud was questioned about whether he had any responsibility for the death of Charlie Woo Summers, the brother of defendant Phillip Summers. Bud denied any involvement in that death, but acknowledged hearing about "some rumor" that he was responsible. Bud later testified that "the Hoovers—every time a Hoover got killed, they blamed me for it."

**22.** Ellis also testified about the perceived gang membership/association of numerous persons who testified at or were somehow connected with the case on trial.

**23.** Officer Ward was the observer that night. Officer Tim Smith was the helicopter pilot.

**24.** The FLIR (forward-looking infra-red) system, unlike the Night Sun, allows officers to track persons on the ground without necessarily alerting those persons that they are being observed.

Ward testified that he could not operate the FLIR and the Night Sun systems at the same time.

**25.** The FLIR system automatically records what is observed, as well as what is said in the helicopter, and the FLIR digital recording from that night (State's Exhibit 11) was played at trial.

**26.** All four men were known members of the Hoover gang. Numerous witnesses testified that Roy Summers was known as "Long John," McKinney was known as "Act Bad" or "Act Cad," Fellows was known as "Robo," and Phillip Summers was known as "Phil Phil" or "Stay High."

**27.** All four men denied ownership or connection to the car; so it was towed away.

**28.** Tulsa police were unable, however, to specifically link this evidence to any particular person or gun or to any of the other evidence in the case against Summers.

¶ 13 Later that same morning, February 26, 2004, Officer Ronald Moulton, the supervisor of the Tulsa Police Department's helicopter unit, reviewed the reports from the previous night and the FLIR recording. Moulton observed on the recording that at one point three individuals appeared to be crouched down together, possibly hiding something in some bushes near a large tree, and that another individual appeared to do the same thing near a fence. Officer Moulton and another officer went to the scene and located what appeared to be the tree from the recording. They were not able to locate anything suspicious near the tree, but when they searched the fence area where the lone individual had crouched down, they found a Bursa .380 semiautomatic pistol.[29] The pistol, which was distinctive because its grips had been completely removed, was subsequently matched to the two .380 casings found in the Vann home.[30]

¶ 14 Sergeant Mike Huff, a supervisor within the Tulsa Police Department's homicide unit, testified that around 2:00 p.m. that same day, he received information that two young black males, who were associated with a red Cadillac, were looking through the bushes in the area where the .380 pistol had been recovered. Huff and Detective Mike Nance, who were well aware of the events of the previous evening and the recovery of the gun that morning, immediately went to the area to investigate, but the men and the Cadillac were already gone. On their way back, however, Huff spotted a "white over red" Cadillac parked in front of a home on Ute Place.[31] Huff testified that they attempted to find a place where they could sit and watch the car, but that it was difficult to find a spot where they would not be noticed. And in just a few minutes, some young black males began looking out the windows of the home, and then four to six of these persons came outside. Huff recognized two people in the group: Robert Fellows and Phillip Summers.

¶ 15 Huff first called Fellows over and began asking him questions. When he then saw Summers, Huff "hollered" over to him and said something like, "Hey, come here." Summers did not respond. Instead, he "bounced a little bit," started to take off running, looked back to see if Huff was going to chase him, which he didn't, and then ran off.[32] Huff testified that Summers was wearing dark-colored jeans and either a black or navy "hoodie" (hooded sweatshirt), that Summers had his right hand in his hoodie pocket the whole time, even as he ran away, and that the pocket appeared to be "weighted down" with something inside.[33] When Huff attempted to ask Fellows questions about what had happened the previous night on Zion Street, in connection with the abandoned Ford Taurus, Fellows denied being there or knowing anything about the incident.

¶ 16 Around 9:00 p.m., on March 4, 2004, Highway Patrol Trooper Patrick Davis was traveling southbound on Interstate 244/Highway 75 in Tulsa, when a blue Ford Tempo came into his lane from the adjacent lane and nearly hit him. Davis immediately put on his lights, pulled in behind the car, and attempted to stop it. As the Tempo pulled toward the shoulder, the passenger-side door opened and a man got out. Davis got out of his car, pulled out his gun, and repeatedly ordered the man to stop and get on the ground, but the man simply jumped the guardrail and ran away. Davis testified that the man had his right hand in the front pocket of his black hoodie the whole time and that he believed

---

29. The gun had a live round in the chamber and seven live rounds in the magazine, and its serial number had been rubbed out.

30. In addition, the bullet found in the left thigh of Ples Vann was identified at trial as being "consistent" with this Bursa .380, though it could not be conclusively matched to it.

31. The home, which belonged to Linda Bell, was less than a mile away.

32. Huff acknowledged that he and Nance were both dressed in "plain clothes" that night, that they were not driving a marked police car, that they did not specifically identify themselves as police officers, and that citizens are not obligated to talk to them.

33. Huff testified that he chose not to chase Summers for safety reasons, since he believed Summers to be potentially armed at the time.

the man was likely carrying a gun or other weapon.

¶ 17 Since he was alone, Davis did not pursue the man, but stayed with the stopped car and its two other occupants and radioed for assistance.[34] Within about 20 minutes, Davis was informed that a man matching the description he had given had been located by Tulsa police officers a few blocks away, at Webster High School. Davis went to that location and identified the man being held, Phillip Summers, as the man who had jumped out of the car and ran.[35] Summers initially refused to give his name, and he denied being the person who had jumped from the car.[36] Summers was booked into jail on a complaint of obstructing an officer, but no charges were ever filed, and he was released.[37]

¶ 18 Tulsa police officers called for a K–9 unit to come to the scene that night, hoping to find a weapon or contraband along the path between the initial stop and Webster High School, where Summers was arrested. Although officers used an article of Summers' clothing to give their dog his scent, nothing was found. Nearly one month later, however, on April 3, 2004, Karry Jordan was preparing to cut down a tree with his neighbor, along their fence line, when he saw a gun lying along the base of the tree, hidden in a bunch of thorny briars. Jordan picked up the gun, unloaded it, took the clip out, and called the police. Jordan lived between the spot where the car had been stopped and Webster High School and remembered the police search on the night of March 4.[38] The gun found by Jordan was a .45 caliber semi-

iautomatic Glock, Model 21. It was later matched to the seven .45 casings found in the Vann home.[39]

¶ 19 On March 19, 2004, Greg McKinney gave a statement to Tulsa police officers regarding what had happened on the night of February 23, 2004, naming Robert Fellows and Phillip Summers as the men who entered the home at 38 East 50th Place North and shot Ples and Shelly Vann. On May 6, 2004, first-degree murder charges were filed against Robert Fellows for the killing of the Vanns. And on May 17, 2004, Phillip Summers was added as a defendant in the case and charged as acting "in concert" with Fellows on both murders. A Bill of Particulars, seeking the death penalty, was later filed against both Fellows and Summers, on December 20, 2004. No charges were ever filed against Greg McKinney.

¶ 20 On October 27, 2004, McKinney was the State's star witness at the preliminary hearing of Fellows and Summers. McKinney acknowledged that at the time he was arrested, on March 4, 2004, he was on probation for a prior offense of drug possession with intent to distribute. And by the time of the preliminary hearing, McKinney's five-year deferred sentence on that charge had been accelerated, and he was incarcerated on that offense. McKinney denied being offered *any* consideration for his testimony and maintained that he was testifying against his fellow Hoovers simply because, "It's the right thing to do." [40]

¶ 21 McKinney testified that on the night of February 23, 2004, he got picked up by

---

**34.** The driver of the stopped car was an older white woman, who was not identified at trial. The passenger in the back seat was Greg McKinney. McKinney was in possession of several small baggies of crack cocaine at the time and was arrested on that basis.

**35.** Davis also positively identified Summers at trial.

**36.** Davis acknowledged at trial that although his car was equipped with a dashboard video recorder, which recorded the stop, and although he reviewed the video of the stop that night, "for some reason" that portion of the videotape was gone when he went to recover it later.

**37.** Tulsa Police Officer Keith Reid testified that he arrested Summers at Webster High School

that night and that Summers was muddy, but he did not have any weapons or drugs on him.

**38.** Reid, who arrested Summers and was involved in the K–9 search that night, later picked up the gun from Jordan. He testified that they had searched the area where the gun was found.

**39.** In addition, the .45 bullet found in the back of Shelly Vann was identified at trial as being "consistent" with this recovered .45 Glock, though it could not be conclusively matched to it.

**40.** McKinney denied ever being told that he could have been charged as an accessory in the case.

Fellows and Summers. They went to a Tulsa hotel where they basically rented a "smoker's car," i.e., Fellows gave a woman (who McKinney did not know) "some dope," so that they could use her car for the night.[41] They then drove around for about 45 minutes smoking marijuana, with Fellows driving, Summers in the front passenger seat, and McKinney in the back. At some point Fellows drove to 38 East 50th Place North and parked the car out front. McKinney testified that he did not know whose house it was or why they were there and that the others did not tell him. McKinney testified that Fellows and Summers, both wearing dark pants and dark hoodies, jumped out and went up to the front door of the home, with their hands in their hoodie front pockets. The car was left running but with the lights off, and McKinney maintained that he simply stayed in the car smoking marijuana the whole time.

¶ 22 McKinney testified that he saw Fellows knock on the front door (with his right hand) and that a large, older, dark-skinned black man, wearing a white t-shirt, came to the front door.[42] The man who answered the door was much taller and somewhat heavier than both Fellows and Summers.[43] According to McKinney, Fellows and Summers entered the home, and shortly thereafter he heard five or more gunshots, which sounded like mini-explosions. After about 45 seconds Fellows and Summers came out, walked to the car, and they drove off. McKinney testified that no one said anything or explained what had happened, and that he didn't ask.[44] They then went to the home of "some females," where they hung out, watched t.v., and smoked marijuana for a while. McKin-

ney testified that while they were there, Fellows pulled a black .45 semiautomatic Glock out of his hoodie pocket and that Summers got a silver .38 semiautomatic, without pistol grips, out of his hoodie pocket. McKinney testified that the two men placed these guns on the table and that they picked up the same guns and put them back in their hoodie pockets when they left. McKinney testified that Fellows and Summers then dropped him off at his home and that they never said anything to him about what had happened.

¶ 23 McKinney testified that he learned about the double homicide the next morning, when he saw it on television. He also testified that two weeks earlier he had heard Fellows say, in front of a bunch of people, "If we can't get Bud, we'll get somebody close to him."[45] McKinney acknowledged at the preliminary hearing that he was part of the stop on February 25, 2004, claiming that he simply walked away from the car, although the others ran, as well as the stop on March 4, 2004, which led to his pending possession charge. McKinney was unable to testify at trial, however, since he was murdered on August 9, 2005.[46]

¶ 24 By the time of the January/February 2008 trial of Phillip Summers, the State had given Robert Fellows what has to be described, based on both timing and content, as a true "sweetheart deal." On February 14, 2007, the State dropped the two counts of capital, first-degree murder that it had filed against Fellows in the Vann double-homicide case, in exchange for his plea of guilty to two counts of accessory after the fact. According to the deal, Fellows would be sentenced after

---

41. This practice of trading drugs (or something else of value) for the use of a drug-user's car, i.e., a "smoker's car," when gang members planned to engage in criminal activity and wanted to make detection of this activity more difficult, was described by numerous witnesses at trial.

42. On cross examination McKinney acknowledged that Fellows had his right arm in a cast at the time, but denied that it prevented Fellows from putting his arm through his hoodie or his hand into his hoodie pocket. McKinney also denied shooting Fellows in the arm.

43. According to the medical examiner, Ples Vann was 6 ft. 3 in. tall and weighed 266 lbs.

44. McKinney did testify, however, that Fellows and Summers were "smiling and laughing."

45. McKinney testified that he didn't know if Philip Summers was there or not.

46. McKinney's complete preliminary hearing testimony was read into evidence at trial during Summers' defense case. Just before the testimony was read, over strenuous defense objection, the jury was informed, without elaboration or explanation, that "Mr. McKinney is an unavailable witness as a result of death." This announcement is the basis for Summers' claim in Proposition II of his appeal.

he testified against Summers at trial, and his State sentence would be entirely concurrent with his sentence in a separate federal racketeering case, *i.e.*, Fellows would not do *any* additional time for his role in the murders of Ples and Shelly Vann. Fellows acknowledged at the outset of his trial testimony that he had numerous prior convictions, including two counts of possession of cocaine with intent to distribute, racketeering conspiracy, and two counts of shooting with intent to kill.[47] On cross examination Fellows also acknowledged that at the time the Vanns were murdered, he was on probation for a separate possession of crack cocaine offense, with a sentence of six years.

¶ 25 Fellows testified that he joined the Hoover Crips gang when he was about 13 or 14 years old and that his street name was "Robo." He testified that the following persons were also members of the Hoover gang: Greg McKinney ("Act Bad" or "Act Cad"), Phillip Summers ("Phil Phil" or "Stay High" or "Ste–Hi"), Roy Summers ("Long John"), Michael Summers ("Mikey D"), Roleitha Summers, Curtis Dion Jones ("Straight Face"), and Mark Bell ("Baby Morton").[48]

Fellows described the ongoing and violent gang rivalry between the Hoover Crips and the Neighborhood Crips and testified that he personally had been involved in five to ten shootouts with Neighborhood gang members.[49] Fellows testified about the importance of respect/disrespect in the gang culture, the idea of "putting in work," *i.e.*, doing things for your gang, and also "getting stripes," *i.e.*, earning the respect of fellow gang members by killing a rival gang member. Fellows testified that Bud Tennyson was a prominent member of the Neighborhood Crips and that he was considered a major target or "major stripe" among the Hoovers. Fellows also testified that in late 2003 and early 2004, there was a belief among the Hoovers that Bud Tennyson was responsible for the murder of Charlie Woo Summers (brother of Phillip Summers), who was killed in December of 2003.[50] In particular, Fellows testified that he had heard Phillip Summers talk about wanting to kill Bud Tennyson, because Bud "had been putting in work in the neighborhood and it would be a major stripe to kill him." [51]

47. The federal racketeering case was an expansive criminal case involving numerous members of the Hoover Crips gang. On October 12, 2006, Fellows agreed to plead guilty to one count of racketeering conspiracy in that case. Within his plea agreement Fellows specifically admitted being a member of the Hoover Crips, which operated by committing violent crimes and drug dealing, and that he personally was involved in a drive-by shooting on March 30, 2001. Fellows testified at trial that he was sentenced to 22 years on that conviction, but he acknowledged that depending on his testimony in the case against Summers, there was a good chance that his sentence could be reduced. Fellows further testified that his deal with the State was established in conjunction with his testimony about the Vann killings at a federal "Rule 11" hearing, which was held on November 9, 2006, and that his plea agreements in federal and state court were intended to resolve all his charges in one concurrent sentence. It should be noted that a federal resentencing "Minute Sheet," which was provided with Summers' motion to supplement the record in this appeal, indicates that on January 7, 2009, on the motion of the federal prosecutor, Fellows was granted a "4–level departure" regarding his federal sentence and that his total sentence was thereby reduced to 137 months.

48. Fellows testified about the street names of the various gang members and that they used these names "in case we do commit crimes and get seen doing something people wouldn't know our real names to tell law enforcement." Fellows explained that because the letter "B" is associated with the rival Blood gang, Crips will often replace that letter with a "C," such that McKinney was also known as "Act Cad." He also testified that because the letters "C–K" can be an abbreviation for "Crip Killer," Crips will often replace these two letters with the letters "C–C" in their writings.

49. Fellows testified that Hoover members would wear navy blue (and sometimes blue and orange or blue and gray) and that Neighborhoods would wear "North Carolina blue." He also testified about gang initiation rites, gang signs and hand signals, the meaning of various slang terms, *etc.*

50. According to his widow, Brandi Summers, who also testified, Charlie Woo Summers was actually killed on January 16, 2004. Fellows testified that he personally thought Bud was responsible for Charlie Woo's murder, but he did not know for sure. Fellows also acknowledged, however, that there were rumors about other persons who might have been involved, including some Hoover Crips known as "T–Loc" and "Little Charlie" and a man named "Mr. Finch."

51. Fellows explained that the Hoovers believed that Bud had been shooting at Hoover Crips and

¶ 26 Fellows testified that on February 23, 2004, he was with Phillip Summers, Paul Summers, Greg McKinney, Mark Bell, and some women, at an apartment in the Sunset Apartments complex, "[s]itting around smoking marijuana and talking about selling drugs and making money, the usual."[52] Fellows testified that Paul Summers had a .40 gun, Phillip Summers had a .45 Glock, and McKinney had a .380 pistol with broken grips.[53] Fellows testified that he himself did not have a gun that day and that his right arm was in a full-arm, L-shaped cast, as a result of being accidentally shot by McKinney.[54] After it got dark, Fellows left with Phillip Summers and McKinney. Fellows testified that he was driving his own red Cadillac, which had a white top, and that he hoped to get some money from a woman known as "Chocolate," who owed him from an earlier drug deal.[55]

¶ 27 Fellows testified that they met up with Chocolate and another woman, who called herself "Trouble," at a Tulsa hotel on Admiral. Fellows testified that he got his $40 from Chocolate, but that they then decided to go out and try to buy her some ecstasy pills. And they decided to take Chocolate's car, which was a green Pontiac four-door.[56] Fellows testified that he drove to a couple of different locations to get ecstasy for Chocolate, but was unable to get any. He claimed that he was "about to give up and just take Chocolate her car back," when Phillip Summers stated that he knew a place where Fellows could get some ecstasy. According

to Fellows, Summers then directed him to 38 East 50th Place North, a place where Fellows had never been and that he did not recognize, though he did know it was in Neighborhood Crip territory. Fellows testified that while they were driving there, Summers was sitting in the front passenger seat, with his .45 Glock in his lap, and that McKinney was seated in back, with his chrome .380 in his lap. All three men were wearing dark blue hoodie sweatshirts and jeans.

¶ 28 As they approached the home, Summers directed Fellows to slow down, turn off his lights, and pull into the driveway behind the Cadillac that was already parked there.[57] Fellows testified that he stayed in the car, with his engine running, while Summers got out, put up his hood, and then urged McKinney to "come on Act Cad." According to Fellows, Summers and McKinney then went up to the front door of the home, with their guns hidden in the front pocket of their hoodies. Fellows testified that the home was dark, but he could see the glow of a television set inside. Fellows testified that he saw Summers knock on the door and could tell that someone had answered the door and opened it slightly, though Fellows could not see who answered or hear what was said, since his car windows were rolled up.[58] Fellows testified that after a few seconds, he saw Summers pull out his gun and start shooting as he entered the home. Fellows testified that he heard multiple gunshots af-

had killed a couple of people, including possibly Charlie Woo Summers.

52. Fellows also testified that he had known Phillip and Paul Summers since grade school, but he had only recently met McKinney. Fellows denied hearing any talk about plans to "put in work" or do any violence that day.

53. Fellows testified that the .45 and the .380 recovered by police appeared to be the same guns.

54. Fellows testified that during January of 2004, he was riding in the back of a car with Greg McKinney and that McKinney was playing around with his .380, when it accidentally went off and shot Fellows in the arm, shattering a bone in his right arm. Fellows testified that he is right-handed and that his cast went from his shoulder to his wrist and wrapped around his hand.

55. "Chocolate" was later identified at trial as Tanisha Pearson, who also testified in the case.

56. When asked why they switched to Chocolate's car, Fellows testified, "Because Chocolate's vehicle was a newer vehicle and it did not burn gas like mine did, and plus if I am going to do a drug deal, I would rather do it in somebody else's car." Yet Fellows had already testified that his Cadillac was actually registered to "some older guy in Muskogee." Fellows acknowledged the term "smoker's car" and how such cars are used by gang members to commit crimes. Nevertheless, Fellows steadfastly denied that there was any plan to engage in gang violence that night.

57. McKinney had testified that they parked on the street. This was one of a number of less significant differences in the stories of that night told by McKinney and then later by Fellows.

58. Fellows testified that McKinney was standing behind Summers on the front porch.

ter Summers went into the home, while McKinney just stood there on the porch "looking like he was shocked." Fellows testified that after a while Summers came out of the home and was making "argumentative gestures" toward McKinney and appeared to be "cussing him out." At that point, according to Fellows, McKinney leaned into the home, holding the door jamb with his right hand as he took one step into the home, and fired a couple of shots from his .380, using his left hand. Afterward, Summers and McKinney came back out, walked to the car, got in, and told Fellows to drive away.[59]

¶ 29 Fellows testified that he began driving back to the hotel where they had met Chocolate, in order to get his car back. He also testified that on the way there, Summers told him that they had been at "Bud's house" and that Bud was not at home, so Summers "shot the guy that opened the door." Summers also told Fellows that he "seen Bud's mom and she looked just like Bud, so he had to shoot the bitch." According to Fellows, McKinney did not say anything. Fellows testified that he was shocked and had not expected anything like that to happen.[60] Fellows further testified that even within the gang culture, women and children are considered off limits. He explained, "You just don't touch them. You don't want anybody touching yours."

¶ 30 Fellows testified that when they got back to the hotel where they had left his car, they switched cars without talking to Chocolate (leaving her car keys under her front seat) and left.[61] They then returned to the Sunset Apartments, where the three of them hung out for a while with Paul Summers,

smoking marijuana and listening to music. Fellows testified that after about 45 to 60 minutes, he and Phillip Summers left together to pick up their girlfriends. They later went to a home on Knoxville, where they met up with a woman named "Sandy," who helped them rent a hotel room where they and their girlfriends stayed that night. Fellows testified that he saw a news report about a double homicide on television that night, which showed the house where they had been, but that they did not talk about what had happened at all.

¶ 31 Fellows testified that the next morning they dropped off their girlfriends and returned to the home on Knoxville, so Summers could change clothes. Later that day, February 24, 2004, they went to the home of Linda Bell, mother of Mark Bell.[62] While they were there Fellows, Phillip Summers, Mark Bell, and Curtis Jones went into a back bedroom and had a conversation. Fellows testified that Jones asked Summers about the murder of the Vanns and that Summers responded, "We smoked a nap-nigger's mama." [63] Fellows testified that when Jones questioned Summers further, Summers told Jones that Fellows "just drove the car." [64] Fellows testified that Summers also told Jones that he had knocked on the door and asked for Bud, but Bud wasn't there, "so he [Summers] said he shot the nigga that answered the door, and then he seen Bud's mama try to run and he said the bitch tried to run, so he shot her." Fellows testified that Summers had his .45 Glock in his lap as he told the story and that Summers "just laughed" about what had happened.[65]

---

59. Fellows testified that the entire shooting episode lasted only about 30 to 45 seconds and that when it was over, he drove slowly away, so as not to attract attention.

60. Fellows testified that when Summers stated that he "had to shoot the bitch" because "she looked so much like Bud," Fellows was thinking to himself, "that is real fucked up."

61. Fellows also testified that while they were driving, Summers was criticizing McKinney for not going into the house and asking him "why he was acting like a bitch, why he froze up."

62. According to Fellows, the Summers family and the Bell family were related, *i.e.,* "cousins."

63. Fellows explained that "nap-nigger" is a disrespectful term that Hoovers use to refer to Neighborhood Crips.

64. According to Fellows, Summers did not say anything to Jones about McKinney's role.

65. Fellows testified that he did not hear Summers say anything else about what had happened that night until after the preliminary hearing in the case, when they were both in jail at the David L. Moss Center, when Summers told him "to hold it down and we both go home." Fellows interpreted this to mean that if he kept his mouth shut, they might both get to go home. Fellows testified that Summers also stated that "Act Cad got on the stand and lied."

¶ 32 Regarding the night of February 25, 2004, Fellows testified that he was driving a black Ford Focus and that Phillip Summers, Roy Summers, and McKinney were with him. Fellows testified that they were all wearing dark hoodie sweatshirts and dark clothing and that they were all armed. This time Fellows had a .32 automatic; Roy Summers had a MAC 11; McKinney had his .380; and Phillip Summers had his .45 Glock.[66] Fellows testified that Roy Summers was driving; Phillip Summers was seated in the front passenger seat; McKinney was seated in the back behind Roy Summers; and he was seated behind Phillip Summers. When asked why they ditched the car and ran, Fellows stated that it was a "smoker's car," that they were not sure if it had been reported stolen, that it should have been returned already, and that they were carrying drugs and guns. Fellows testified that they all went and stashed everything that they had under a tree and then took off running.[67] Fellows testified that after being apprehended and interviewed by police that night, they all simply walked to McKinney's grandma's house and got a ride home.

¶ 33 Fellows acknowledged being contacted by Tulsa police officers later that same day, February 26, 2004, about what had happened the previous night and that he lied to them and denied being a part of it. Fellows testified, "That is what you are supposed to do when you come in contact with the police on the streets." Fellows noted at trial that he was taken into custody in late April of 2004 for his role in the Vann homicides. Fellows

acknowledged that he did not like Bud Tennyson and that if he had had the opportunity, he would have been willing to shoot him. He maintained, however, that he would not shoot women and children.[68] Fellows testified that during Summers' trial he was being held in a county jail under an alias, because he was now a "snitch," and that snitches "get killed." Fellows testified at trial that although he hated snitches, he decided to cooperate in the Vann case "because I did not want to die for something I did not do"; and he insisted, "I didn't kill anyone."

¶ 34 Tanisha Pearson testified that in early 2004 she was an exotic dancer and went by the name "Chocolate." She testified that she knew Fellows, McKinney, and Phillip Summers, and that she had dated Roy Summers. She testified that on February 23, 2004, she was staying at a hotel on Admiral in Tulsa, with her friend Kelly Nixon, who was known as "Trouble." Pearson testified that she loaned her green, four-door Pontiac Bonneville to Fellows and McKinney that night, so Fellows could get some ecstasy for her and Nixon.[69] Pearson also testified that she talked with Fellows, McKinney, and both Roy and Phillip Summers at the Sunset Apartments on the night of February 25, 2004. She testified that the four men were in a black Ford Focus and that after talking with Roy, she became worried that they were going to get into some kind of violent gang conflict.[70] So Pearson contacted an ATF (Alcohol, Tobacco and Firearms) agent that she knew, Peggy Tobin, about what she knew and her concerns.[71]

---

66. Fellows testified that all four men had their guns out and on their laps. Fellows denied any discussion about intending to engage in violence on behalf of the Hoovers that night, but he did admit that "if we ran into some problems it would have happened."

67. In addition, Fellows testified about who was who in various scenes within the FLIR recording, including identifying when he and the Summers brothers were putting their drugs and guns under a tree, while McKinney was in a different area. Fellows testified that when he and Phillip Summers later went back to retrieve their guns and drugs, they were not able to find them.

68. Fellows testified, "[T]hey have nothing to do with what is going on in the street. Women and children ought to be respected at all costs."

69. Pearson testified that this was the only time she asked Fellows to purchase drugs for her and the only time she loaned him a car, though she did loan her car to numerous other people "in that circle." Pearson only remembered seeing Fellows and McKinney that night and denied giving Fellows any money.

70. Pearson testified that Roy Summers was the driver, Phillip Summers was in the front passenger seat, and McKinney and Fellows were in the back.

71. Mike Huff, the Tulsa Police homicide unit supervisor, testified that he received a call from ATF agent Peggy Tobin on February 25, 2004, with the information about the armed men in the black Ford Focus, and that he was the one who provided that information (via radio broadcast)

¶ 35 Roleitha Summers testified that she was the older sister of defendant Phillip Summers.[72] She began her testimony by acknowledging that after originally being charged with racketeering in the federal conspiracy case against various Hoover gang members, on December 7, 2005, she agreed to plead guilty to intimidating a witness, namely, Tanisha Pearson.[73] Roleitha testified that as part of her plea agreement, she agreed to assist the government and to testify whenever asked to do so, by any government entity, and in particular, to testify against her brother Phillip in the current case.[74] In exchange, Roleitha was ultimately sentenced to just 54 months of probation, with credit for the time she had already served, and was thereby allowed to go home and parent her daughter, who would have been 5 years old at the time.[75]

¶ 36 Roleitha testified that while she was still a young teenager, she was "jumped in" to the Hoover Crips gang on 57th Street in Tulsa.[76] Roleitha testified that being "jumped in" means agreeing to fight and basically be "beat up" by other gang members, and that her younger brothers Roy, Paul, and Phillip watched as she was beat up by older Hoover males.[77] She testified that she sometimes had to help support her family and that she did so by selling drugs and by stealing cars and then selling their parts.

On cross examination, Roleitha admitted that she had sold drugs more times than she could count (certainly more than 100) and that she had probably stolen "hundreds" of cars. She admitted being the "enforcer" for the Hoover Crips among female members, *i.e.*, when other girls got "out of line," she would get called to "take care of business." Roleitha testified that she was "violent," fought "a lot," and always carried a gun—though she denied ever pulling the trigger or earning a stripe.

¶ 37 Roleitha testified that she was a "major player" in the Hoover gang at the time of the Vann murders, though not at the time of trial. She also freely admitted that she still "despised" members of the Neighborhood Crips, whom she described as "offies" and "nap-niggers." She testified that Bud Tennyson was a much-hated Neighborhood Crip and that it would have been a "major stripe" for any Hoover to kill or harm him. Roleitha testified that although she did not know who killed her brother, Charlie Woo, it was rumored among Hoovers at the time that Bud was responsible.

¶ 38 Roleitha also testified that some time after the shooting of the Vanns, she met up with her brother Phillip in the home of Chris Ann Carter.[78] Roleitha testified that although the house was "full of people," she

to all on-duty Tulsa police officers that night. The audio of the FLIR helicopter recording includes a reference to the fact that the Tulsa police were specifically on the lookout for "the Summers brothers" that night and that they expected them to be armed.

72. There were 7 children in the Summers family: Charles, Michael, Roleitha, Roy, Paul, Teresa, and Phillip. Phillip was the baby. Among these children, two were violently killed (Charles and Teresa), and all were apparently Hoover gang members for at least some part of their lives.

73. In particular, Roleitha admitted that in March of 2004, her brother, Michael Summers, told her to beat up Pearson and bring her to him, because he believed Pearson was cooperating with law enforcement. Roleitha admitted that she and two other women found Pearson at a Tulsa hotel and assaulted her, and that they were attempting to take Pearson to Michael when she escaped.

74. Roleitha testified that she first told the Tulsa district attorney that Phillip had admitted to her that he shot Shelly Vann ("because she looked so

much like Bud") at a federal Rule 11 hearing, on August 24, 2005. She testified that she was told that if she would cooperate and "help out" law enforcement, they would go "easier" on her.

75. Roleitha testified that she had been denied bond in her case, because she had "ran the last time." She also testified that if she had been convicted of racketeering, she believed she would have been sentenced to approximately 25 years.

76. Hence Roleitha was considered part of the "57th Street Hoovers" set within the larger gang.

77. Roleitha acknowledged that she was a gang member before these younger siblings were. She described her youngest brother, Phillip, who would have been about 7 years old at the time, as "my baby" and testified that she helped nurture and provide for him as he was growing up.

78. Roleitha admitted on cross examination that at that point in her life, she was regularly using both marijuana and ecstasy.

pulled her brother aside near the kitchen and asked if he had been involved in the shooting of the Vanns. She testified that she confronted Phillip because "that was the word on the street" among Hoovers, and she did not want to believe it. She testified that Phillip responded that he went to the home looking for Bud and that he "didn't mean to," but that he shot Mrs. Vann "because she looked just like Bud." Roleitha further testified that Phillip told her that McKinney and Fellows were with him, that McKinney "shot the daddy," and that Fellows drove the car. According to Roleitha, Phillip also told her that they were using Tanisha Pearson's car, who she also knew as "Chocolate." [79]

¶ 39 Roleitha testified that she remembered Fellows being in an arm cast at the time, because McKinney had shot him in the arm. She identified the .380 with the "messed up" handle as a gun she had seen with McKinney.[80] She further testified that it was a "common occurrence," which she had frequently witnessed, for guns to be traded around among members of their gang set.[81]

¶ 40 Roleitha testified that growing up she had had a "good relationship" with her brother Phillip. When asked why she was testifying against him, Roleitha responded, "Because I don't want to leave my little girl no more." When asked by the prosecutor if there were any other reasons for her testimony, such as not wanting to be part of "all this killing" any more, she responded: "No. Because if it weren't for her, I wouldn't be doing it." [82] According to the record, Roleitha became overcome with emotion at least once during her testimony, and she acknowledged that she could not look at defendant Phillip Summers "[b]ecause that's my brother." Roleitha also agreed that after being out of jail and back with her little girl for two years, she'd "do about anything" to make sure that she did not have to go back to jail.

¶ 41 Brandi Summers testified that she was the wife of Charlie Woo Summers and that he was murdered on January 16, 2004.[83] Brandi acknowledged that she received a letter from her brother-in-law, Phillip Summers, in May of 2004, a copy of which was available at trial.[84] Brandi explained the meaning and significance of various gang symbols, slang, and abbreviations in the letter, including tombstones marked "C–Woo GIP" and "T–baby GIP," as referring to Charlie Woo and Teresa Summers, both of whom were violently killed, as "Gangsters in Peace." [85] Brandi testified that she interpreted the letter from Phillip as asking her to basically find out what she could about the case against him.[86] She further testified, in

---

79. Roleitha noted that after the shooting of the Vanns, she attempted to get a .380 for herself, because she expected renewed violence and retaliation, since both parents and kids were considered "off limits" within the gang culture, since they had "nothing to do with" gang business.

80. Roleitha acknowledged on cross examination, however, that she had earlier testified, at her federal Rule 11 hearing, that this gun belonged to Fellows.

81. In particular, Roleitha testified that she had seen the .380 and the Glock .45 recovered in the case in the hands of Hoover gang members other than McKinney, Fellows, and Phillip Summers.

82. She denied, however, that anyone had threatened to take her child away if she did not testify.

83. At the time of Summers' 2008 trial, the murder of Charlie Woo Summers, which was believed to be gang related, remained unsolved.

84. A copy of this hand-written letter, dated May 5, 2004, was entered into evidence at trial as State's Exhibit 71, over vigorous defense objec-

tion. The State obtained a copy of this letter in May of 2004, when an employee at the Cimarron correctional facility opened the letter before mailing it for Summers. The jury, however, was not informed how the State became aware of the letter.

85. Brandi also explained the abbreviations "RIP" (rest in peace), "OG" (old gangster), "YG" (young gangster), as well as various specific Hoover Crip conventions, such as substituting the letters "CC" for "CK," substituting the letter "C" for "B," *etc.*

86. The hand-written letter reads, in part, as follows:

> What is the police talking bout out thurr, that's gottum fuccin wit yall … I can't see no news here no radio "R" get any kinda information about this shit they trying pend on me. So what all are they trying say exactly? Who else is they trying put on the case wit me? …. I wanna know everything that's goin on out thurr & what the word is wit this new case I'm facin. Brandi what I need u ta do for me please is find out the exact time & dates of the

response to defense questioning, that the letter indicated to her that her brother-in-law was "scared" that he was "possibly going to be charged with murder and he doesn't know why" and that she did not see anything in the letter suggesting that he was admitting to killing the Vanns or anyone else.[87] Brandi testified that she interpreted the letter as requesting that she "assist [Phillip] in defending the case," but she denied ever replying or doing anything at all in response to his request.

¶ 42 Brandi also denied having any idea what Phillip was referring to in the letter's various references to "Act–Cad," i.e., Greg McKinney.[88] Brandi further testified that in discussions among Summers family members and their associates after the murder of her husband, the only name she ever heard as a possible suspect was Cornelius Finch, who had since also been murdered. She further testified that the first time she ever heard the name of Bud Tennyson even mentioned in connection with her husband's murder was a few weeks before Phillip Summers' 2008 trial.[89]

¶ 43 Robert Yerton, a fingerprint expert from the Tulsa Police Department's forensic laboratory, testified at trial about all the items related to the Vann homicide that he examined and from which he attempted to glean fingerprint evidence. In particular, he examined the following items visually, with a laser, and then through the use of a Super Glue "fumes tank" technique: the Bursa .380

and its cartridge, magazine, and ammunition; the Glock .45 and its empty magazine; the seven .45 casings and the two .380 casings found at the scene; and the plastic baggie and ten rounds of Winchester .45 cartridges found under the tree. Yerton testified that despite all this effort, not a single latent fingerprint was even recovered from any of these items.

¶ 44 In fact, the only fingerprints that were recovered in connection with the Vann homicides were a number of latent fingerprints that were recovered from the storm door at the Vann home. Yerton testified that he compared all the prints recovered from the storm door to the known prints of Ples and Shelly Van, Bud and Quantee Tennyson, Robert Fellows, Greg McKinney, and Phillip Summers; but none of the prints on the door could be matched to any of these persons. Yerton testified that the prints recovered from the screen door were also put into Oklahoma's computer fingerprint database, known as AFIS (Automated Fingerprint Identification System), but no "matches" for any of the latent prints recovered from the door were found that way either.[90] Yerton noted that before he even began processing the Glock .45, the empty Glock magazine, and the Winchester .45 live cartridges, he swabbed them all for potential DNA evidence.[91]

¶ 45 Valerie Fuller, the State's DNA expert, subsequently testified that she analyzed

---

murders. I need ta know what evidence they have so far & whatever else there is ta know. In a postscript at the end of the letter, Summers adds: "p.s. I wanna hear from u & know what's goin on, they got me fucced up. I ain't guilty of shit."

**87.** Brandi also testified that she had never heard Phillip Summers make any statements in person about killing anybody.

**88.** The letter from Phillip Summers states:
It's one lil homie that I ain't fa sure about that know a lot & that's lil Act–Cad. I been havin 2nd thoughts about him a whole lot & he my lil nigga, but I swear, I hope he didn't double cross me. I'm just hopin he aint doin what I think he is. I say that cuz it's just somethin not right about his situation right now.... The letter later states: "The fuccin police is suddenly comin up wit all this new shit on me that

only Act–Cad would have a real clue about, even though I ain't did shit...."

**89.** Brandi testified that she was "still surprised" to hear this theory and that she had "absolutely not" previously ever heard Bud's name in connection with her husband's murder.

**90.** Yerton testified that such "unidentified latent prints" could be from persons who have never been fingerprinted or whose fingerprints have never been put into the AFIS system.

**91.** Yerton testified that he swabbed all the areas on the Glock that would have to be touched in order to hold and use the weapon. Yerton testified on cross examination that he did not swab any of the other evidentiary items for DNA evidence, however, because he was not asked to do so.

all the DNA evidence obtained in the case.[92] Fuller testified that on both the Glock .45 handgun and the magazine associated with that gun, she found DNA material from at least two different people.[93] She did not, however, obtain any DNA material from the swabbings associated with the Winchester ammunition. Fuller further testified that both Robert Fellows and Phillip Summers were excluded as possible donors to the DNA material found on both the Glock and its magazine. Fuller also testified that she tested the DNA swabbings that were taken from the Bursa .380 handgun, its magazine, and a single cartridge associated with that gun. She testified that DNA material was found on both the Bursa gun and its magazine that appeared to be a mixture of two male persons.[94] Fuller testified that both Fellows and Phillip Summers were excluded as possible donors to the DNA material found on the .380 and its magazine, but that Greg McKinney could *not* be excluded, *i.e.*, McKinney was a possible contributor to the DNA found on these items.

¶ 46 Finally, Fuller testified that she analyzed the swabbings of the .45 casings found at the crime scene and that on one of the casings, she recovered a mixture of DNA material from at least two people. Fellows, McKinney, and Phillip Summers were all excluded as potential donors to this mixture. Fuller acknowledged that she was never asked to analyze any potential DNA evidence from swabbings of the Vanns' storm door. She also acknowledged that she did not find any DNA evidence whatsoever in the case that potentially matched Phillip Summers.

Hence Summers was excluded as a possible donor regarding *all* the fingerprint evidence and *all* the DNA evidence recovered in connection with the Vann double homicide.

¶ 47 Within his case-in-chief, Defendant Phillip Summers presented the preliminary hearing testimony of Greg McKinney, which was read by persons playing each role. Summers also presented the testimony of various witnesses who suggested that Fellows had lied about not being a shooter in the Vann home and that he should not be believed. Officer Roger Smith, a Tulsa police officer, testified that on April 29, 2004, while he was guarding Fellows prior to his transport back to jail, Fellows asked him, "Which gun was my DNA found on?" [95] Victor Miller, who was well known to the Tulsa district attorney, also testified on Summers' behalf.[96] Miller testified that during 2005 he was incarcerated at the David L. Moss Center jail, along with Robert Fellows and Bud Tennyson. He testified that Fellows approached him while they were in a recreation area and asked Miller if he knew anything about forensics and the law. Miller testified that when he asked Fellows what he was talking about, Fellows told him that "him and his homeboy went over to some people's house and they went and handled their business." Miller testified that he was familiar with what Fellows was accused of and that he interpreted Fellows as talking about killing some people. Miller further testified that he did not specifically recall the name Fellows mentioned as his "homeboy," but that the name was not Phillip Summers.[97] Miller fur-

---

**92.** Some of the DNA swabbings analyzed were collected by another (non-testifying) agent.

**93.** Fuller testified that one of the DNA donors to the Glock magazine might have been female.

**94.** No DNA material was recovered from the cartridge, *i.e.*, the live round.

**95.** Fellows had just finished meeting with a police detective. Smith further testified that Fellows told him that if he told Tulsa police what they wanted to know, "he would be putting his mother and his baby's life in danger."

**96.** Miller was incarcerated in federal prison at the time of Summers' trial, serving sentences on

a whole range of offenses related to a bank robbery. He estimated that he had about 20 felony convictions. In particular, Miller admitted that he had pled guilty and been convicted of second-degree murder in state court (after his original guilty plea to first-degree murder was reversed on appeal) and that he had been convicted of two counts of capital first-degree murder in state court in a separate case, which had been reversed by this Court and not yet retried at the time.

**97.** When asked if the name was Gregory McKinney, Miller testified that he couldn't recall and didn't know. Miller noted that his conversation with Fellows was never completed, however, because at that point some other guys walked over, and their discussion was cut off.

ther testified that a few days later he observed an exchange between Fellows and Bud Tennyson. Miller testified that as Fellows was being brought in from the recreation area at the jail, he heard Bud call out to him from his cell, "Man why did you kill my moms and my pops, man?" And according to Miller, Fellows responded, "I done it because you is a bitch." [98]

¶ 48 Finally, Summers presented the testimony of Officer Derrek Lewis, the Tulsa police officer who was originally the lead investigator in the Vann double homicide. Lewis acknowledged that he had been to the Vann home prior to the February 2004 homicides, because the home had been "shot up quite a bit" in earlier drive-by shootings. Lewis testified about how the entire Vann homicide investigation and prosecution had "evolved" over the years, from being focused on Fellows and Summers as the shooters, because he and others believed Greg McKinney, to the belief that McKinney and Summers were the shooters. Lewis acknowledged a number of Crime Stoppers tips that came in regarding the case, including one on May 24, 2004, which named "Ray Campbell" as the person who had killed the Vanns. Lewis acknowledged that no effort was made to follow up on this particular tip, probably because it was anonymous. Lewis also gave his opinion, based upon his experience in the field, about how the events most likely transpired in the Vann home on the night of the shootings, although Lewis admitted that neither the medical examiner nor any other investigating officer had testified in support of his particular theory. [99]

¶ 49 The State presented a single witness in its rebuttal case: Bud Tennyson. Bud acknowledged being in segregation at the David L. Moss Center jail in 2005, but denied knowing or ever speaking to Victor Miller. Bud admitted that he did see Robert Fellows there and that he attempted to ask Fellows why he killed his parents. Bud testified that he was in the recreation area at the time and could see Fellows through the window of Fellows' cell, which was on the second floor, and that although they could not hear each other, they could read each other's lips. Bud testified that he mouthed the question, "why he killed my mommy and daddy" and that he added to Fellows, "you got a mommy and daddy just like I have a mommy and dad." According to Bud, Fellows responded by mouthing the words, "I didn't kill your mama and dad." Bud denied ever having the conversations described by Miller.

## ANALYSIS

¶ 50 In Proposition I, Summers alleges that his right to a fair trial was violated when the trial court refused to let him present the testimony of Cleon Christopher Johnson, who was present and willing to testify at trial, as himself having responsibility in the Vann homicides and in support of Summers' "alternative perpetrator" defense that "Demarco Campbell," and *not* Phillip Summers, was the third Hoover male involved with the shooting of Ples and Shelly Vann. [100] In addi-

---

**98.** The cross examination of Miller got rather out of hand, as the district attorney got very upset and repeatedly accused Miller of testifying simply to get back at him personally, because he was still prosecuting Miller for two counts of first-degree murder and re-seeking the death penalty. Miller repeatedly denied having any grudge against the Tulsa district attorney and stated that he was testifying in the current case because "I want to be comfortable within myself." In addition to impeaching Miller with his numerous convictions, the district attorney was allowed to impeach Miller about his knowledge of "forensics," over vigorous defense objection, by reviewing some of the forensic evidence in the ongoing homicide case against him—referring specifically to Miller's fingerprints in the car of Mary Bowles and to bullets removed from the bodies of Bowles and Gerald Thurmond, which were "matched" to a gun found in the toilet tank of Miller's hotel room. At one point defense counsel objected "to Mr. Harris screaming at Mr. Miller" and asked the Court "to admonish Mr. Harris not to raise his voice," but the trial court overruled the objection.

**99.** At the end of his testimony, Lewis acknowledged that he was aware that the bullet in Fellows' arm had been removed at some point and that although it could not be conclusively matched to the .380 Bursa found at the scene, it was found to be a .380 slug.

**100.** Demarco Campbell is also referred to as "Demarko," "Marko," and "Marco" Campbell. According to the materials submitted with Summers' motion to supplement the record, a man named Ray Campbell, who had a brother named Demarco Campbell, was found shot to death on

tion, Summers asserts that his trial counsel was ineffective for failing to more fully develop the Johnson evidence and other evidence that would have supported this alternative perpetrator defense.[101]

¶ 51 After defense counsel gave notice of its intent to present the alternative perpetrator testimony of Cleon Johnson, the State filed a motion in limine attempting to prevent this testimony and to prevent any argument from defense counsel that either Johnson or "Marco Campbell" had any responsibility for the murders of Ples and Shelly Vann.[102] Just before the defense team began presenting evidence in Summers' case in chief, the trial court held an evidentiary hearing on this motion and ultimately allowed Johnson, who was present and available, to testify in court, without the jury present, about what he knew about the Vann case.[103] Before beginning his actual testimony, Johnson was sworn in, warned about the penalty for perjury, and also specifically warned that if he admitted participating in a first-degree murder, his testimony could be used against him in a prosecution on this charge and that the possible punishments for this crime in Oklahoma are life, life without parole, and death.

¶ 52 Cleon Johnson then testified as follows.[104] Johnson began by admitting that he had been convicted of "a whole bunch" of felonies and that he was then incarcerated in state prison based upon convictions for robbery, murder, and three counts of shooting with intent to kill. He acknowledged that based upon his sentences on these convictions, some of which were consecutive, there was "a high probability" that he would never be released from prison. Johnson acknowledged knowing Phillip Summers, but testified that he himself was a member of the "1077 Hoover Crip gang," which is a different Hoover set than that of Phillip Summers. Johnson denied talking to Summers in the preceding five years and denied owing any favors to members of the Summers family or any associates of Phillip Summers.

¶ 53 Johnson testified that in late 2003 and early 2004, he was a "shot caller" within the Hoover Crips, with the power to order a killing, and that he "was the one who put the hit on Bud [Tennyson]."[105] Johnson testified that he was "locked down" in F–24 at the David L. Moss jail with Demarco Campbell and Greg McKinney, in mid to late 2003, and that they used to go to the recreation yard together.[106] Johnson testified that he was with Campbell and McKinney "in the yard"

March 8, 2004, shortly after the Vanns were killed, in what appeared to be a gang-related killing.

101. On April 13, 2009, Summers tendered to this Court a motion to supplement the record on appeal and a request for an evidentiary hearing, along with his brief in chief in this case. The materials within and attached to this motion relate to Summers' claims in Proposition I and II, and this motion is today accepted for filing by this Court.

102. The State's motion in limine and brief in support were filed on January 29, 2008, the day the State finished presenting its case in chief against Summers. The State argued that its investigation of the Vann murders "has yielded no evidence which supports the proposed testimony" and that the proposed testimony of Johnson (i.e., statements from Marco Campbell to Johnson admitting Campbell's involvement in the killings) would be entirely hearsay.

103. The trial court specifically stated that it was granting an "evidentiary hearing" to allow Summers to present (and the State to test) the testi-

mony of Cleon Johnson. And the court directed the parties to question Johnson on anything they thought was relevant. Consequently, as an evidentiary hearing has already been held on this evidence, and the actual testimony of Johnson is available to this Court, there is no need for another evidentiary hearing. Hence defendant Phillip Summers' request for an evidentiary hearing on this claim is denied. The claim will be decided on its merits herein.

104. Johnson acknowledged that he also uses the name "Cleon Smith," which is the name on his birth certificate and social security card, but that his mother enrolled him in school under the name "Cleon Johnson."

105. Johnson testified that he "took over the Hoover Chapter in Tulsa" when "Mike Maconey (phonetic)" got locked up. Johnson testified that no one had promised him anything for his testimony and that he knew he could be charged with murder for admitting to ordering the hit.

106. When asked where Campbell was located at the time of the trial, Johnson testified that he was in federal prison. When asked about his rela-

at the jail when he ordered them to kill "Bud and whoever else [was] in the house." [107] Regarding motive, Johnson testified that he once witnessed Ples Vann (who worked at the jail) and Demarco Campbell get into a "heated" disagreement, and that afterward Campbell told Johnson that he wanted to kill Ples, his wife, Bud, and Quantee. Johnson testified that he was opposed to the idea at first, "because, you know, I mean, we have a code, no women and children." Johnson testified that he changed his mind, however, after Bud killed his best friend, "Denon Woods" or "Little Wet." [108] Johnson testified that at that point, he told them "enough is enough" and ordered the hit, i.e., "kill Bud and whoever else [is] in the house." [109]

¶ 54 Johnson further testified that some time after the Vanns were killed (on February 23, 2004), Campbell was re-arrested and brought back to David L. Moss and that they ended up in the segregation area together. According to Johnson, Demarco Campbell reported back that he had done what Johnson asked him to do and "exactly how everything went down." In particular, Campbell reported that he and some other Hoovers had killed the Vanns, but that there was "one problem"; they had gotten wrong information from a Hoover stakeout of the home, and Bud was not actually at home at the time. Johnson testified that Campbell then told him what had happened and that the participants were himself, Robert Fellows, Greg McKinney, and Tanisha Pearson.

¶ 55 According to Johnson, Pearson, i.e., "Chocolate," was used "as a decoy" to knock on the door, because they did not think the Vanns would open their door to two men that they had never seen before. According to Johnson, Campbell said that they forced Pearson to knock on the door, even though she was "worried about getting her fingerprints on the door," while the men hid on the side of the house, and that when Ples Vann opened the door, "they rushed off in there and opened fire." According to Johnson, Campbell said that they shot Ples Vann in the leg and that after he fell, they shot him in the head with the .380, and then they shot Shelly Vann with the .45. Johnson testified that Campbell initially said that he was the first one in and had shot Ples Vann in the face, but that Campbell later said he was "just in the car" and did not have a gun, but that McKinney had a .380 and Fellows had a .45. Johnson further testified that McKinney and Fellows, who were also incarcerated at the jail after the killings, told him "the exact same story." [110]

¶ 56 When asked about any specific facts that would "lend credence" to what Campbell told him, Johnson further testified that Campbell told him about Ples being shot in the leg and head, that Shelly was shot in the back, and that they were "cooking or something." Johnson added, "It was pork chops or something and, you know, [Campbell] said it smelled good off in the house and that he wanted to make a plate." Johnson also noted that Campbell told him that Ples Vann had a pork chop in his hand that night.[111]

tionship with him, Johnson described Campbell as "my little homey" and a "good friend."

107. Johnson later testified that although he ordered Campbell and McKinney to carry out the hit, Fellows somehow got involved "in the mix of it."

108. Although the transcript lists this name as "Little Wekki (phonetic)" and "Little Wek," the materials attached to Summers' supplemental filing suggest that Johnson actually said "Little Wet," which was the known street name of Ronald Devon Woods, a Hoover Crip gang member who was found shot to death on November 22, 2003. (According to the 11/25/2003 *Tulsa World* article about Woods' murder, proffered by Summers, police sources indicated at that time that "[a]t least seven men have been killed this year in an ongoing gang feud.")

109. Johnson also described another motive that Campbell had for wanting Bud dead, namely, that Bud had "shot up his mama's house."

110. Johnson testified that McKinney and Fellows both told him that they were the ones who went inside.

111. Johnson testified on cross examination that a day or two after the murders (and before Campbell had been brought back to jail), he met with Sergeant Mike Huff. According to Johnson, he told Huff then that he knew who had killed the Vanns (since he ordered the hit), although he did not tell Huff that he ordered the hit. In particular, Johnson testified that he told Huff that it was Demarco Campbell and that Campbell had earlier told Johnson "he was going to go kill Ples, Shelly and Bud." Johnson testified that he had another meeting with Huff later, after he had spoken with both Campbell and McKinney at the

When Johnson was asked how he knew that Campbell's story about what had happened was "reliable or truthful," Johnson testified that "Gregory McKinney and Robert Fellows also told me the stories and all their stories was exactly the same." [112]

¶ 57 Johnson admitted that it was not until January 25, 2008, just five days earlier, that he first acknowledged (to a defense investigator) that he was the one who ordered the hit. Johnson testified that when he earlier spoke to a defense investigator, on April 4, 2006, he told this investigator that Demarco Campbell killed the Vanns, along with McKinney, Fellows, and Pearson (Chocolate), and that Pearson was used as a decoy to get the Vanns to open their door.[113] When asked why he was now admitting his own role in the double homicide, Johnson testified that he had had a "change of heart" and "needed to do what is right." [114]

¶ 58 During cross examination Johnson admitted that he had testified before the federal grand jury, but said he was only asked about "Michael Summers and the Summers boys." Johnson asserted that "[t]hey wanted me to sit there and lie on the Summers boys because they been trying to get the Summers [boys] for the longest." The prosecutor then impeached Johnson with his federal grand jury testimony from March 3, 2004.[115] When he was shown his grand jury testimony, Johnson initially testified, "I see this, but I don't remember saying none of this." He later acknowledged that the transcript shown to him at the evidentiary hearing was his earlier testimony.

¶ 59 Although the exact content of Johnson's federal grand jury testimony is not entirely clear in this record, Johnson's story before the federal grand jury was apparently quite different from his testimony at Summers' trial. In the federal case, Johnson had testified that "Long John" (Roy Summers) said that his brother "Tom Tom" (Paul Summers), Marco Campbell, Mike D. Summers, Monte Reed, someone named "Tyrone," Arthur Bradley, and "a female" were all involved in the shootings of Ples and Shelly Vann, but that Bradley stayed in the car.[116] According to this story, Mike D. had the female go up and knock on the door, which is "how Mike D. usually set people up," while Monte Reed, Marco Campbell, Paul Summers, and Tyrone were on the side of the house. Then when Ples Vann opened the door, "Marco rushed up there and shot him in the face and in the chest, and then the mama, I guess she was trying to run to the back room or whatever, and Paul Summers came in there and shot her in the arm and the back and stuff."

¶ 60 After his grand jury testimony was read to him, Johnson was asked whether it was his testimony, to which he responded, "I guess," and whether it was true, to which he responded, "No." When asked if he lied to the grand jury, Johnson testified, "They told me to." When pressed further if he had lied, Johnson responded, "Yes, sir, I sure did." After both parties then indicated that they had no further questions for Johnson, the trial court announced that since Johnson had admitted to committing perjury before the federal grand jury, he was officially committing Johnson, under 21 O.S.2001, § 501, to

jail, and that he told Huff everything that these men had told him.

112. The prosecutor later vigorously cross-examined Johnson about how he could know what Campbell had told him was "true," since Johnson himself was not there. And Johnson again testified that "Gregory McKinney and Robert Fellows also told me the stories and all the stories was exactly the same."

113. Campbell referred to McKinney and Fellows as "prospects" or "potential gang members," who still had to "prove themselves worthy."

114. When asked what was "right," Johnson responded, "What is right is, you know, to come

forward telling the truth. I mean, I don't see no reason to let an innocent man be convicted of something he had no involvement in."

115. The federal grand jury case was entitled, "In the Matter of Mike D. Summers." Before he was confronted with his earlier testimony, Johnson testified that during his grand jury testimony, the *only* person he identified as being involved with the Vann homicide was Campbell, "Just Marko." Johnson admitted that he did not tell the grand jury about the involvement of either Fellows or McKinney and testified that he did not provide any names other than that of Campbell.

116. Johnson testified at the federal grand jury that his testimony there was based entirely upon

the custody of the Sheriff, for possible perjury proceedings "on the federal side."

¶ 61 The trial court then inquired whether Defendant Summers was still proffering Johnson's testimony. After defense counsel announced that Summers was indeed still proffering this testimony, the trial court ruled: "Denied on two grounds. Number one, it is hearsay, which is inadmissible. Secondly, it is inherently unreliable. There is no clear corroborating circumstance brought to my attention which would indicate the truthfulness of this statement."[117] Summers asserts, in Proposition I, that this trial court ruling violated his fundamental constitutional right to a fair trial and, in particular, his right to present evidence that someone other than himself was the perpetrator.

■■ ¶ 62 In its 2006 decision in *Holmes v. South Carolina*,[118] the United States Supreme Court proclaimed, as it had in the past: "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"[119] After reviewing its seminal cases on this topic, the *Holmes* Court summarized:

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established

rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.[120]

The *Holmes* Court noted that the Constitution permits judges to exclude evidence that is (1) repetitive, (2) only marginally relevant, or (3) poses an "undue risk" of harassment, prejudice, or confusion of the issues.[121] The Court recognized that the principle that defendants must be allowed a "meaningful opportunity to present a complete defense" is particularly important in cases where a defendant desires to present evidence that someone else, other than the defendant, committed the crime(s) at issue, *i.e.*, third-party perpetrator evidence.[122]

¶ 63 The defendant in *Holmes* was convicted of beating, raping, and robbing an 86–year-old woman, who later died from her injuries.[123] Extensive forensic evidence was presented at his trial, including evidence that Holmes' underwear was found to contain DNA from both Holmes and the elderly victim.[124] Holmes contested the reliability of the State's forensic and other evidence at trial, and he wanted to put on evidence that another man, Jimmy McCaw White, was the one who had attacked and killed the victim.[125] However, the trial court refused to let Holmes present this third-party perpetrator evidence, and the South Carolina Supreme Court affirmed Holmes' convictions, based

what "Long John" told him, although Long John apparently did not claim he himself was there.

117. The trial court's ruling and cited legal basis for this ruling will be discussed further *infra*.

118. 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006).

119. *Id.* at 324, 126 S.Ct. at 1732 (quoting *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984))).

120. *Id.* at 326, 126 S.Ct. at 1732.

121. *Id.* at 326–27, 126 S.Ct. at 1732 (citations omitted).

122. *Id.* at 327, 126 S.Ct. at 1733.

123. Hence Holmes was convicted of first-degree murder, as well as first-degree burglary, first-degree criminal sexual conduct, and robbery. He was sentenced to death for the murder. *Id.* at 321–22, 126 S.Ct. at 1730.

124. Evidence was presented that DNA found on the underwear was a mixture of two individuals, and that 99.99% of the population, other than Holmes and the victim, were excluded as contributors to this mixture. *Id.* at 322, 126 S.Ct. at 1730. Other forensic evidence presented at trial included evidence that Holmes' palm print was found in the victim's home and evidence that a mixture of blood from both Holmes and the victim was found on Holmes' tank top. *Id.*

125. In particular, Holmes wanted to put on evidence that several witnesses saw White in the area at the time and that White had admitted to several people that he committed the crimes. *Id.* at 323, 126 S.Ct. at 1730.

mainly upon the strength of the State's forensic evidence.[126]

¶ 64 In *Holmes*, the United States Supreme Court vacated this decision, based upon its conclusion that the rule applied by the South Carolina Supreme Court did not "rationally serve the end" that such evidentiary rules are "designed to promote, *i.e.*, to focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues."[127] And evidence that a third party, not on trial, has admitted to committing the crimes at issue cannot be said to have a very weak "logical" connection to the central issues at a trial involving these same crimes. Hence the Supreme Court reversed the decision of the South Carolina Supreme Court, which had affirmed Holmes' convictions, despite the strength of the State's case against Holmes, *i.e.*, despite the fact that the State's evidence was certainly sufficient to convict him.[128]

■ ¶ 65 In *Gore v. State*,[129] which was decided in the year prior to Holmes, this Court likewise reversed the capital murder conviction of a defendant who was linked to the crime at issue with DNA evidence, because the trial court did not allow the defendant to present the third-party perpetrator evidence that he wanted to introduce.[130] Within *Gore*, this Court recognized that "[t]he Constitution guarantees criminal defendants 'a meaningful opportunity to pres-ent a complete defense,' "[131] and also that "[f]ew constitutional rights are more fundamental than that of an accused to present witnesses in his own defense."[132] Ultimately, this Court found that the trial court violated Gore's right to a fair trial when it did not allow him to present evidence that Ronald Williamson had previously been convicted of the murder for which Gore was being tried, *i.e.*, the murder of Debra Sue Carter, as well as some of the evidence suggesting that Williamson was involved in this crime.[133]

¶ 66 In the current appeal, the State quotes language from the *Gore* decision suggesting that a defendant's third-party perpetrator evidence is inadmissible unless the defendant can provide evidence of an "overt act" by the third party toward the commission of the crime. Yet a careful reading of the entire *Gore* decision, including the separate opinions filed in that case, reveals that any true "overt act requirement," in the context of third-party perpetrator evidence, died a (not very quiet) death in *Gore*. Although the main opinion addressed the history and development of this would-be requirement at some length and attempted to maintain some form of this requirement,[134] this analysis was agreed to by only one other judge, who is not actually a member of this Court.[135] And two of this Court's sitting judges specifically stated that the time had come to "explicitly abandon the 'requirement' of proof of an

---

**126.** *Id.* at 324, 126 S.Ct. at 1731.

**127.** *Id.* at 330, 126 S.Ct. at 1734.

**128.** *Id.* at 331, 126 S.Ct. at 1735. The Supreme Court did not engage in any kind of "harmless error" analysis in *Holmes*. *See id.*

**129.** 2005 OK CR 14, 119 P.3d 1268.

**130.** Glenn Dale Gore was convicted of the first-degree murder of Debra Sue Carter, who was violently killed in 1982. The State had previously charged and convicted two other men of this same crime, Ronald Williamson and Dennis Fritz, based in part upon the testimony of Gore. After the conviction of Williamson was later set aside by the Tenth Circuit Court of Appeals, DNA testing revealed that sperm found in the vagina and rectum of the victim could not have come from either Fritz or Williamson, but rather was that of Gore. *Id.* at ¶¶ 1–11, 119 P.3d at 1270–72.

**131.** *Id.* at ¶ 21, 119 P.3d at 1275 (quoting *Crane*, 476 U.S. at 690, 106 S.Ct. at 2146).

**132.** *Id.* (citing *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)).

**133.** *Id.* at ¶¶ 25–32, 119 P.3d at 1276–78.

**134.** *See id.* at ¶¶ 13–23, 119 P.3d at 1272–76; *see also id.* at ¶ 23, 119 P.3d at 1275–76 ("Accordingly, proof of an overt act in the commission of the crime is required, but it is as a threshold showing, and not as the sole determining factor.").

**135.** The *Gore* decision was authored by Judge Gary Lumpkin; Oklahoma Supreme Court Justice Steven Taylor, sitting by designation, concurred. Judge Charles Johnson specially concurred, with an opinion specifically noting that "Oklahoma's overt act rule ... can be addressed another day." 119 P.3d at 1278 (C. Johnson, J., specially concurring).

overt act in admissibility determinations concerning third party perpetrator evidence.'"[136] Perhaps more importantly, however, all fives judges who decided the *Gore* case voted to reverse the conviction of Glen Gore, based upon the exclusion of his proffered third-party perpetrator evidence,[137] even though this evidence did *not* actually include any specific evidence of an "overt act" by Williamson toward the murder of Carter.[138]

■ ¶ 67 Nevertheless, all of the judges involved in the *Gore* decision apparently did agree on a somewhat less specific standard regarding third-party perpetrator evidence, namely, that a defendant can present such evidence "as long as there is *some quantum of evidence*, which is more than mere suspicion and innuendo, *that connects the third party to the commission of the crime*."[139] In *Pavatt v. State*,[140] this Court's next big decision involving a claim of wrongful exclusion of third-party perpetrator evidence, which came down nearly two years later and after *Holmes*, the "overt act requirement" is not even mentioned.

¶ 68 In *Pavatt*, this Court addressed a claim that the trial court had erred in failing to allow the defendant to present a particular letter at his trial, which was received by the defendant during his trial and which purported to be from a jail inmate named Zjaiton Wood. The handwritten letter contained Wood's "confession" to the murder that Pavatt was accused of and detailed how Wood claimed to have "committed the crime."[141] Wood, however, was unwilling to testify at Pavatt's trial, and Wood's counsel strongly objected to Pavatt's attempt to force Wood to testify, on Fifth Amendment grounds. This Court began its analysis by finding that defendant Pavatt had no right to compel Wood's testimony.[142] The question then became whether a defendant in Pavatt's position could put into evidence, as third-party perpetrator evidence, the bare letter from Wood purporting to confess to the murder.

¶ 69 This Court noted in *Pavatt* that it remains "mindful ... that a defendant has a right to present competent evidence in his own defense, and that rules of evidence may not arbitrarily impinge on that right."[143] This Court then found that "[w]hether Appellant was denied the right to present a defense ultimately turns on whether the evidence at his disposal was admissible."[144]

---

136. *Id.* at 1278 (Chapel, P.J., concurring in result). Judge Arlene Johnson joined the separate opinion of Judge Charles Chapel and also wrote her own separate opinion, noting that "[n]ine decades of jurisprudence ... contains little if any analysis for the reason behind Oklahoma's narrow [overt act] rule." *Id.* at 1278 (A. Johnson, J., concurring in result). Judge A. Johnson's separate opinion, which noted that she too "would abrogate the requirement that a defendant provide evidence of an overt act before alternate suspect evidence may be admitted," was likewise joined by Judge Chapel. *Id.* at 1279.

137. 2005 OK CR 14, ¶¶ 31–32, 119 P.3d at 1277–78.

138. The lead opinion in *Gore* states: "While there may not be a single identifiable overt act toward the commission of the crime, the evidence comprising the case against Williamson was evidence of acts or circumstances that tend clearly to point to Williamson, rather than [Gore], as the killer." *Id.* at ¶ 26, 119 P.3d at 1276 (emphasis added). Although the opinion states that "Williamson's prior conviction for the victim's murder meets the requirement of an overt act in the commission of the crime," *id.* (emphasis added), a conviction is not an "act" at all.

139. *See id.* at ¶ 24, 119 P.3d at 1276 (emphasis added); *see also* 119 P.3d at 1278 (Chapel, J., concurring in result) ("Certainly, there should be 'some quantum of evidence, which is more than mere suspicion and innuendo, that connects the third party to the commission of the crime.' However, as this case shows, that is all that ought to be required.").

140. 2007 OK CR 19, 159 P.3d 272.

141. *Id.* at ¶ 40, 159 P.3d at 285–86.

142. *Id.* at ¶¶ 43–44, 159 P.3d at 286–87.

143. *Id.* at ¶ 42, 159 P.3d at 286 (citing *Chambers v. Mississippi*, 410 U.S. at 302, 93 S.Ct. at 1049). Although this Court's *Pavatt* opinion discusses portions of both *Holmes* and Gore, it does not review or apply (or reject) the standards for determining the admissibility of third-party perpetrator evidence that were promulgated in those cases.

144. *Id.* at ¶ 45, 159 P.3d at 287. As will be discussed herein, this assertion, taken to its logical extreme, is somewhat contrary to the fundamental holding of *Holmes* and its predecessors, including *Chambers v. Mississippi*, which is that

The *Pavatt* opinion then invoked the evidentiary rule of § 2804(B)(3), which is one of four specific exceptions to the hearsay rule "if the declarant is unavailable as a witness."[145] Section 2804(B)(3) contains what is often described as the hearsay exception for "statements against interest" and also contains the following provision, which would appear to apply, in particular, to much of what might otherwise be described as "third-party perpetrator evidence," particularly the "confessions" of third parties: "A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."[146]

¶ 70 After recognizing this general evidentiary rule, we then tested the evidence proffered by Pavatt in that case, namely, the hearsay letter purporting to confess to the murder at issue, against this evidentiary rule and concluded that the letter did not meet this test, i.e., the proffered letter was held not to be sufficiently corroborated.[147] We emphasized that in making this determination, the trial court must consider "any relevant evidence—even evidence the State discounts—in determining whether the statement is trustworthy enough to be admissible."[148]

¶ 71 We do not question the holding of *Pavatt,* finding that the defendant's right to a meaningful opportunity to present a complete defense was not violated by the trial court's exclusion of the letter from the "compulsive jailhouse confessor" in that case.[149] Nor do we question the validity, in general, of this well-established evidentiary

rule, i.e., § 2804(B)(3). We do note, however, that if third-party perpetrator evidence proffered by the defendant is held to too high a standard under this rule, i.e., being denied admission unless "corroborating circumstances *clearly* indicate the trustworthiness of the statement"—a standard that the State does *not* have to meet regarding the admissibility of evidence suggesting the guilt of the accused, including the defendant's own confession—application of this seemingly reasonable standard could, in fact, violate the defendant's right to a meaningful opportunity to present his defense.

¶ 72 One of the underlying principles in *Holmes* and its predecessors is that the defendant's evidence should not be treated with more suspicion than is the State's evidence, and also that in our system, the trier of fact is the most appropriate entity for deciding disputes about which evidence is most reliable or "trustworthy." We noted in *Pavatt* that "[o]ut-of-court statements, tending to exonerate the defendant and implicate the declarant, have traditionally been viewed with great suspicion," citing two cases as support for this observation, one decided in 1915 and the other decided in 1888.[150] Such an observation does not, however, fully comport with the later-developed, but now well-established doctrine regarding the defendant's right to a meaningful opportunity to present his defense. Such a rule, at least when too rigorously applied, would appear to be "disproportionate" to the (reliability) end that it is intended to promote, since it subjects the defendant's evidence to a more demanding admissibility evaluation than it does

State evidentiary rules that impact a defendant's right to present evidence—particularly evidence that someone else committed the crime—must themselves be examined to ensure that the application of these rules does not arbitrarily impinge on the defendant's right to present evidence in his own defense.

nal case, made by a codefendant or other individual implicating both the codefendant or other individual and the accused, is not within this exception." *Id.*

145. *See* 12 O.S.Supp.2002, § 2804(B). This rule was not raised by either party in the case. *Pavatt,* 2007 OK CR 19, ¶ 45, 159 P.3d at 287.

146. *See* 12 O.S.Supp.2002, § 2804(B)(3). This provision continues as follows: "A statement or confession offered against the accused in a crimi-

147. *Pavatt,* 2007 OK CR 19, ¶¶ 46–48, 52–53, 159 P.3d at 287–88, 289.

148. *Id.* at ¶ 46, 159 P.3d at 287.

149. *See id.* at ¶ 47, 159 P.3d at 288 (the author of the letter had apparently "attempted to 'confess' to other local murders besides this one").

150. *See id.* at ¶ 46 n. 12, 159 P.3d at 287 n. 12.

the State's.[151]

¶ 73 In the current case, the trial court relied, explicitly and exclusively, upon *Pavatt* and this particular portion of § 2804(B)(3) as the basis for its ruling that Cleon Johnson would not be allowed to testify. The trial court, having just announced that it was referring Johnson for a possible federal perjury prosecution, inquired of the defense team whether it was still proffering his testimony. After defense counsel announced that Summers was indeed still proffering Johnson's testimony, the trial court ruled: "Denied on two grounds. Number one, it is hearsay, which is inadmissible. Secondly, it is inherently unreliable. There is no clear corroborating circumstance brought to my attention which would indicate the truthfulness of this statement." The trial court then cited *Pavatt* as "giv[ing] the trial courts instructions on this," namely, "that a statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."[152] The trial court then concluded: "There is no—there are no circumstances that have been presented to me which would allow me to find that there is trustworthiness of the statement. Your offer is denied. The motion [in limine] of the State is sustained."

¶ 74 At the outset, this Court must recognize that this analysis is *much* too cursory. The trial court was clearly unimpressed by the proffered witness and was probably greatly offended by Johnson's blatant admission that he had "lied" during his 2004 testimony before the federal grand jury ("Yes, sir, I sure did.").[153] Nevertheless, a defendant's constitutional right to "a meaningful opportunity to present a complete defense" does not depend on whether the trial judge, himself or herself, likes or believes the defendant's witnesses.

¶ 75 We begin our analysis by recognizing that Cleon Johnson's testimony (1) that he, himself, ordered the killing of "Bud and whoever else [is] in the house," (2) that he gave this order to Demarco Campbell and Greg McKinney (and no one else), and (3) that Johnson's motive for doing so was his personal belief that Bud Tennyson had killed his best friend, Little Wet, is certainly *not* "hearsay."[154] Nor has the State offered any valid reason for the exclusion of this direct, non-hearsay testimony. Unlike the jailhouse confessor in *Pavatt,* Johnson was willing to testify and to directly implicate himself in the crimes at issue, even though this testimony potentially subjected him to an additional prosecution for two counts of first-degree murder. This Court finds that the trial court clearly abused its discretion in refusing to allow Johnson to testify that he himself ordered the killing of the Vanns, to whom he gave this order, and his motive for doing so.

¶ 76 Whether Johnson should have been permitted to testify about what Demarco Campbell told him regarding *Campbell's* involvement in the shootings and how they occurred is a closer call. This testimony would indeed be hearsay, *i.e.,* an out-of-court statement of the declarant offered for the truth of the matter asserted, at least to the extent that the testimony was offered to

151. *See Holmes,* 547 U.S. 319, 326, 126 S.Ct. 1727, 1732 ("[T]he Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote....").

152. Although the transcript refers to *"Pravett,"* the trial court's explicit citation of this case as "May 8, 2007, 2007 Oklahoma Criminal 19," as well as the material invoked from this decision, leave no doubt that the trial court was indeed referring to *Pavatt,* 2007 OK CR 19, 159 P.3d 272.

153. It should be noted that although Johnson admitted that he "lied" in his federal grand jury testimony, this testimony occurred just 9 days after the Vann homicides, when Johnson might not yet have had contact with any of the actual shooters, and that Johnson described all of the information that he had at that time as something he was told by Roy Summers, *i.e.,* "Long John," who did not claim that he himself was actually involved in the shootings.

154. Johnson's testimony that he witnessed Campbell and Ples Vann engaged in a "heated disagreement" is likewise not hearsay evidence, though under *Gore,* the admissibility of such motive evidence would still depend on the availability of other evidence that could connect Campbell to the actual commission of the murders. *See Gore,* 2005 OK CR 14, ¶ 24, 119 P.3d at 1276.

exculpate Summers as being one of the shooters.[155] And it is this testimony that must be tested against the rule of *Holmes* and its ancestors and progeny.

¶ 77 The State maintains that the testimony of Johnson about what Campbell said, most importantly, that it was Campbell (and not Summers) who accompanied Fellows and McKinney on the night they shot and killed the Vanns, was clearly hearsay evidence and that it was properly excluded under *Pavatt* and § 2804(B)(3). Specifically, the State maintains that the trial court correctly concluded that Summers failed to present evidence that "clearly indicated" the "trustworthiness" of Johnson's testimony and that this testimony was thereby properly excluded.

¶ 78 Summers responds by pointing out some of the aspects of Johnson's testimony that potentially made it "trustworthy." Johnson's testimony about what Campbell told him about the Vann shootings includes a number of specific details about the crime and how it happened, which are fundamentally consistent with the evidence presented at trial: that the shooters got bad information and Bud was not at home as expected; that the shooters were able to enter the home without forcing entry; that Ples Vann had a pork chop in his hand and that the home smelled like pork chops; that Ples Vann was shot in the leg and the head and at least once with a .380; and that Shelly Vann was shot with a .45 and in the back. While it is true that not all of the "facts" cited by Johnson were accurate and that Johnson could have learned some of the details of the Vann murders from a source other than Campbell,

these factors affect the weight and ultimate believability of Johnson's testimony, but not its admissibility.

¶ 79 In addition, Johnson's testimony about what Campbell told him includes information about an additional "fact" that was not previously known, but which is consistent with known facts and potentially answers some of the remaining questions in the case.[156] Specifically, Campbell's description of the involvement of Tanisha Pearson as a "decoy" at the Vann home was not previously alleged or known, but fits with known facts, *i.e.*, both Bud and Quantee Tennyson insisted that their parents would not have just opened their door to "strange men" standing on the front porch, and Pearson had already admitted to knowing both Fellows and McKinney and to helping them on the night of February 23, 2004 (by loaning them her car). This evidence also potentially answered a number of unanswered questions in the case, namely, how the shooters were able to enter the Vann home without any sign of forced entry, and who was the source of the various fingerprints on the front door that could not be attributed to any member of the victims' family or to any of the alleged shooters.[157] Hence there was evidence that could have been found to "corroborate" the trustworthiness of Johnson's testimony about what Campbell told him. And the fact that Johnson was willing to implicate himself in the murders and to admit that Campbell committed them after being instructed to do so by him, *i.e.*, Johnson, is an additional factor

---

155. *See* 12 O.S.Supp.2002, § 2801(A)(3) (definition of "hearsay"). Summers attempts to argue, for the first time on appeal, that these statements of Johnson about what Campbell said happened are not actually "hearsay," under the rule excluding statements among "co-conspirators" from the definition of "hearsay." *Id.* at § 2801(B)(2)(e) ("A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."). In order to even make this argument, Summers has to claim that Johnson's statements about what Campbell said were being offered against Fellows, rather than in support of Summers' affirmative defense, and that former co-defendant Fellows remained a "party" to Summers' case, even though Fellows had already

pled guilty and was not being tried with Summers. Although this argument is creative, it lacks any support in law (and none is offered) and trial "logic." Fellows was not on trial, and Summers had no right to offer substantive evidence against him; nor was this evidence being offered for this purpose.

156. *Cf. Pavatt*, 2007 OK CR 19, ¶ 53, 159 P.3d at 289 ("A confession tends to be more trustworthy if it provides hitherto-unknown facts which are not only verifiable, but also consistent with known facts.").

157. And Pearson testified that she did not have any felony convictions; hence her fingerprints would not be expected to be in the AFIS system.

suggesting the potential trustworthiness of Johnson's testimony.

¶ 80 At the end of the day, however, this Court concludes that the trial court abused its discretion by denying Summers the right to present the testimony of Johnson—including Johnson's testimony that it was Campbell and not Summers who accompanied Fellows and McKinney on the night of the Vann shootings—because in the context of *this* particular trial, it simply violated Summers' right to a fair trial to do so.[158] The State's case against Summers was fundamentally dependent on the testimony of numerous witnesses who were not much more "trustworthy" than Johnson, including witnesses who had potentially more motive for lying than he did, *e.g.*, Robert Fellows, Roleitha Summers, Bud Tennyson, and Quantee Tennyson. In this context, it violated Summers' right to a fair trial and to the presentation of a meaningful defense to prevent him from fully presenting Johnson's testimony.

¶ 81 In *Holmes v. South Carolina*, the Supreme Court warned:

[T]he true strength of the prosecution's proof cannot be assessed without considering challenges to the reliability of the prosecution's evidence. Just because the prosecution's evidence, *if credited*, would provide strong support for a guilty verdict, it does not follow that evidence of third-party guilt has only a weak logical connection to the central issues in the case. And where the credibility of the prosecution's witnesses or the reliability of its evidence is not conceded, the strength of the prosecution's case cannot be assessed without making the sort of factual findings that have traditionally been reserved for the trier of fact. . . .[159]

The current case is certainly *not* one where the defendant has conceded the reliability of the State's evidence or its witnesses.

¶ 82 Phillip Summers has vigorously and consistently contested the reliability of the State's evidence and its witnesses. And there can be no real doubt that some of the State's star witnesses, particularly Robert Fellows and Roleitha Summers, have an established track record of lying and of willfully violating the law whenever they perceive that it is in their best interest to do so. In addition, unlike in *Holmes* and *Gore*, the forensic evidence available in the current case does not even implicate Phillip Summers. Phillip Summers is *excluded* as a contributor to all of the fingerprint and DNA evidence that the State was able to muster, despite extensive efforts to find and identify such evidence in the Vann home and on the guns, casings, bullets, and ammunition potentially connected with these crimes.

¶ 83 In this setting, in a trial with so many gaps in the evidence and with no forensic evidence linking the defendant to either the crime scene or the murder weapons; in a trial with so many unsavory witnesses, who have admittedly lied and broken the law as a matter of course in the past, and who have obvious and admitted personal motivations to testify falsely in the current case; in a trial where the two other persons who actively facilitated and committed the crime, who have *admitted* involvement in the shootings of Ples and Shelly Vann, have been able to completely avoid any actual punishment for these murders simply by being willing to point the finger at their gang-banging friends and cohorts, . . . it is hard to understand why Phillip Summers was not allowed to present the testimony of Cleon Johnson.[160]

**158.** In addition, this Court notes that Johnson repeatedly testified that Robert Fellows told him "the exact same story," about what happened on the night Ples and Shelly Vann were shot, as the one Johnson was attributing to Demarco Campbell. Fellows had already testified as a State witness during Summers' trial, and the "story" attributed to Fellows by Johnson was quite different than Fellows' testimony at trial, particularly on the issue most crucial to Phillip Summers, *i.e.*, the identity of the third male person who was with Fellows and Greg McKinney on the night of February 23, 2004, and who assisted them in the murders of the Vanns. Hence on remand the trial court should consider whether Johnson's testimony about what *Fellows* told him happened that night (and possibly Greg McKinney as well) was admissible as impeachment evidence, as a prior inconsistent statement of a testifying witness.

**159.** 547 U.S. at 330, 126 S.Ct. at 1734 (emphasis in original).

**160.** Greg McKinney avoided being even charged in the case, since he joined the State's team so quickly; and the State's admission that they can-

¶ 84 Johnson was available and willing to testify, and even if his testimony could have been substantially impeached, so was the testimony of most of the witnesses who were directly involved with both the victims and the alleged perpetrators, since practically all of these persons were heavily involved in a gang (either the Neighborhoods or the Hoovers) and the violent criminal lifestyle of their gang. In this context, this Court concludes that the jury that had been impaneled to decide Summers' guilt and determine his fate should have been allowed to hear the testimony of Cleon Christopher Johnson, in order to decide, consistent with Summers' right to due process and to "a meaningful opportunity to present a complete defense," whether Johnson's testimony might possibly give that jury some "reasonable doubt" about Summers' guilt.

¶ 85 This Court finds that Summers' right to a fair trial and to the opportunity to present a complete defense was unconstitutionally violated by the trial court's wholesale exclusion of the testimony of Johnson. Furthermore, given the highly contested nature of the evidence presented and the limitations of the State's evidence—in particular, no forensic evidence linking Phillip Summers to either the crime scene or the murder weapons—this Court cannot conclude that this constitutional violation was harmless beyond a reasonable doubt.

¶ 86 Because Phillip Summers is entitled to a new trial and a new factual determination of his guilt, the remainder of his claims on appeal are rendered moot and therefore need not be addressed. This case is reversed and remanded for a new trial.

### Decision

¶ 87 The first-degree murder convictions of Phillip Anthony Summers are **REVERSED**, and this case is **REMANDED FOR A NEW TRIAL**. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2010), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

not pursue him now, *i.e.,* now that the State believes it mistakenly let off one of the actual

LEWIS, J., concurring in part, dissenting in part.

¶ 1 Cleon Johnson would have testified for the defense that he ordered the murders of Ples and Shelly Vann, and their son, Bud Tennyson, as retaliation for Tennyson's involvement in the murder of a member of Johnson's gang, the Hoover Crips. Johnson would have testified that he gave this alleged order to Demarco Campbell while the two were detained in the David Moss Criminal Justice Center. Johnson was a convicted felon and admitted perjurer with plenty of questionable motives for giving this testimony. His credibility was subject to proper proof at trial and could have been weighed by the jury in considering his trial testimony. I concur in the Court's opinion that this much of Johnson's proposed testimony was relevant to who killed Ples and Shelly Vann. Because this testimony met the broad test of relevance long established by the rules of evidence, exclusion of this testimony was error under section 2402 of the Oklahoma Evidence Code and the holding of *Gore v. State*, 2005 OK CR 14, ¶¶ 13–29, 119 P.3d 1268, 1272–77. However, the record before the Court firmly convinces me that Johnson's confession that he ordered these murders could have no substantial influence on the outcome in Appellant's trial. Exclusion of the evidence was harmless and does not warrant reversal.

¶ 2 Aside from the confession that he ordered the murders, Cleon Johnson's proposed testimony consisted entirely of extrajudicial statements attributed to others, offered to prove that Demarco Campbell, not the Appellant, committed the murders. These statements were hearsay. 12 O.S.Supp.2002, § 2801(A)(3) (hearsay is an out-of-court statement offered to prove the truth of the matter asserted). After receiving Johnson's proposed testimony *in camera,* the trial court found that the evidence was "hearsay" and contained "no clear corroborating circumstance brought to my attention which would indicate the truthfulness of the statement." The trial court's conclusion here clearly referred to pertinent language in Ti-

shooters, since "you cannot indict a dead man," cannot be much consolation to Phillip Summers.

tle 12, section 2804(B)(3) of the Oklahoma Evidence Code, the statement against interest exception to the hearsay rule, which provides in part:

A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

The question presented by this ruling is whether the trial court abused its discretion in excluding the evidence as hearsay. An abuse of judicial discretion is an "unreasonable, unconscionable and arbitrary action taken without proper consideration of the facts and law pertaining to the matter submitted." *Harvey v. State*, 1969 OK CR 220, ¶ 9, 458 P.2d 336, 338.

¶ 3 The trial court's exclusion of Cleon Johnson's hearsay testimony did not result in the kind of due process violation that confronted the Supreme Court in *Holmes v. South Carolina*, 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) and *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). The Constitution's due process guarantee prohibits "the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote." *Holmes*, 547 U.S. at 326, 126 S.Ct. at 1732. By contrast, our *Gore* jurisprudence embodies precisely the kind of reasonable limitations on third party perpetrator evidence that the Supreme Court recognized in *Holmes* (in a footnote, no less) as "widely accepted" and consistent with due process of law. 547 U.S. at 327, n., 126 S.Ct. at 1733, n. (citing *Gore* and other state cases). Oklahoma's standard of admissibility for such evidence is reasonable and longstanding. The news of its death is exaggerated.

¶ 4 The firmly established and widely accepted rules of evidence form an equally important component of the due process of law. Within this procedural framework, the constitutional "right to present a meaningful defense" is a right to present admissible *evidence* important to one's defense, nothing more or less. *Pavatt v. State*, 2007 OK CR 19, ¶ 45, 159 P.3d 272, 287 (defendant's right to present evidence in his defense ultimately turns on whether evidence at his disposal is admissible). The proponent of evidence at trial bears the burden to lay a proper foundation for its admission. *Cline v. State*, 1989 OK CR 69, ¶ 8, 782 P.2d 399, 401; *United States v. Porter*, 881 F.2d 878, 882 (10th Cir.1989). In addition to showing the unavailability of the hearsay declarant(s), which the majority seems to assume without comment,[1] the proponent of a statement against interest, when offered to exculpate the accused under section 2804(B)(3), must also establish "corroborating circumstances" that "clearly indicate the trustworthiness of the statement."

¶ 5 The majority incorrectly suggests that only slight corroboration of the alleged hearsay with some known facts of the case compels its admission as a matter of constitutional law. However, the language and purposes of section 2804(B)(3), and case law applying that rule, indicate that the proponent must show corroborating circumstances related to the *exculpatory facts* that the statement is offered to prove. Put another way, the proponent must establish corroborating circumstances clearly indicating that the exculpatory "matter asserted" in the hearsay statement is trustworthy. *Pavatt*, 2007 OK CR 19, ¶¶ 47–53, 159 P.3d at 287–89 (trial court considered circumstances suggesting exculpatory matters asserted in hearsay statement were recently fabricated, and properly excluded the statement); *Primeaux v. State*, 2004 OK CR 16, ¶¶ 31–54, 88 P.3d 893, 901–904 (where trial court determined "matter asserted" for its truth in alleged statement against interest was untrustworthy, statement offered to exculpate accused was properly excluded as hearsay); *Porter*, 881 F.2d at 883 (recognizing "the

1. The majority opinion recites Cleon Johnson's statement that Demarco Campbell is somewhere in federal prison. Robert Fellows, another of Cleon Johnson's alleged hearsay informants, testified at Appellant's trial and was clearly available. Only Greg McKinney was clearly unavailable to testify as a result of his untimely death. 12 O.S.Supp.2002, § 2804(A)(4) (defining unavailability).

need for corroborating circumstances that clearly indicate the trustworthiness of [declarant's] statement exculpating [defendant]") (emphasis added); *see also, Holmes,* 547 U.S. at 323, 126 S.Ct. at 1730 (eyewitness testimony placing hearsay declarant near the scene of the crime corroborated hearsay asserting declarant's incriminating statements about murder to four other witnesses); *and Chambers,* 410 U.S. at 300, 93 S.Ct. at 1048 (independent eyewitness testimony that hearsay declarant was seen with a gun immediately after shooting, and once owned same caliber weapon as one involved in murder, corroborated hearsay evidence of declarant's confession to three other witnesses).

¶ 6 Cleon Johnson's proposed testimony was excluded by the trial court's discretionary application of this carefully balanced evidentiary rule. The trial judge received the testimony *in camera,* encouraged counsel to ask any questions of Johnson they thought relevant, and considered the testimony in light of all the circumstances. Unlike the testimony erroneously excluded in *Chambers* and *Holmes,* the record amply supports the trial court's finding that the statements offered here are not properly corroborated or trustworthy. The majority opinion shows that Cleon Johnson himself is anything but trustworthy. He would undoubtedly perjure himself just as readily to "cheat the gallows of its due or consign innocence to a felon's cell," *Coleman v. State,* 6 Okl.Cr. 252, 283–84, 118 P. 594, 607 (1911); and has seemingly attempted both in this very case. However, Johnson's credibility really is not the issue. 2 Leo H. Whinery, *Oklahoma Evidence: Commentary on the Law of Evidence* § 31.17 (2d ed. 2000) ("it is the *hearsay statement* that must be corroborated and not the *credibility of the witness* who testifies to the statement") (emphasis in original).

¶ 7 The critical consideration here is that the proponent of the hearsay offered no corroborating circumstances to indicate the trustworthiness of the exculpatory matters asserted therein, i.e., the assertions indicating that Demarco Campbell, rather than the Appellant, murdered the Vanns. Nothing established Campbell's presence at the crime scene, or even in Tulsa, at the time of the murders; nothing established his opportunity to commit the crimes; nothing placed him in the company of the self-admitted participants, McKinney and Fellows; nothing established his access to either of the murder weapons—both recovered, at different times, along pathways so recently traveled by Appellant and his friends. The majority reproaches the trial court's analysis as "*much too cursory,*" while avoiding any close factual comparisons of the statements tendered here with the corroborated statements offered by the defendants in *Chambers* and *Holmes.* The absence of factual corroboration starkly distinguishes Cleon Johnson's proposed testimony from the kind of probative evidence excluded in those cases; and provides sufficient reason to affirm the trial court's exclusion of the statements as hearsay. *Pavatt,* 2007 OK CR 19, ¶ 52, 159 P.3d at 289 (statements against interest offered to exculpate accused were inadmissible "because there simply was nothing offered to corroborate them").

¶ 8 Section 2804(B)(3) of the Oklahoma Evidence Code is "nothing like" the arbitrary rules that worked injustice in *Chambers* and *Holmes.* *Pavatt,* 2007 OK CR 19, ¶ 19, 159 P.3d at 289. Indeed, the Supreme Court of Indiana has noted that Federal Rule of Evidence 804(B)(3) "closely mirrors" the approach of the Supreme Court in *Chambers,* allowing certain exculpatory hearsay where corroborating circumstances clearly indicate the trustworthiness of the statement. *Thomas v. State,* 580 N.E.2d 224, 226 (Ind.1991). Federal Rule 804(B)(3) "serves to assure a defendant his due process right to present evidence in his favor while protecting the trial court's ability to exclude evidence that is irrelevant or insufficiently trustworthy." *Thomas,* 580 N.E.2d at 226. Oklahoma's rule is substantially identical in purpose and effect. The district court did not abuse its discretion by excluding the proposed defense testimony as hearsay, and its ruling did not violate due process of law. I respectfully dissent.

LUMPKIN, J., dissent.

¶ 1 Because this opinion disregards case law which has been consistent since the early

days of statehood, and seeks to give an expansive interpretation to a U.S. Supreme Court decision that violates the Rules of Evidence, I must respectfully dissent to the decision rendered.

¶2 While I agree that Cleon Johnson should have been allowed to testify as to what he said and who he told, the exclusion of his testimony was harmless beyond a reasonable doubt as it did not have a substantial influence on the outcome. *See Simpson v. State,* 1994 OK CR 40, ¶37, 876 P.2d 690, 702.

¶3 Further, I cannot agree to the majority's attempt to make the Oklahoma Evidence Code[1] irrelevant to the trial of a criminal case. This Court has already interpreted and applied the U.S. Supreme Court decision in *Holmes v. South Carolina,* 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) in *Pavatt v. State,* 2007 OK CR 19, 159 P.3d 272, where we stated:

Appellant refers us to *Gore v. State,* 2005 OK CR 14, 119 P.3d 1268, and *Holmes v. South Carolina,* 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006), to support his claim that he was entitled, as a matter of due process, to present evidence of a possible third-party perpetrator. In *Holmes,* the Supreme Court found that a state evidentiary rule governing admissibility of third-party perpetrator evidence ran afoul of the Sixth and Fourteenth Amendment rights to a fair trial. The defendant in *Holmes,* charged with rape, burglary, robbery, and capital murder, proffered testimony suggesting that the forensic evidence against him had been contaminated and/or planted, and that another man, White, had admitted to the crime to several other people. White denied making any incriminating statements to others, and offered an alibi. The trial court excluded this evidence. The state appellate court affirmed, holding that third-party perpetrator evidence should be excluded any time the evidence against the defendant is "strong," particularly when there is "strong forensic evidence" of the defendant's guilt.

The United States Supreme Court found the rule applied by the state appellate court in *Holmes* to be too rigid. The Court pointed to several of its past cases, striking down similar rules that "serve[d] no legitimate purpose" or were "so disproportionate to the ends that they [were] asserted to promote." Yet the Court recognized the authority of legislatures, and courts, to impose reasonable evidentiary rules in criminal trials, and noted that such authority-even regarding the admission of third-party perpetrator evidence-was not directly at issue. The only issue in *Holmes* was the South Carolina Supreme Court's recent expansion of its decades-old, judge-made rule, to make the admissibility of third-party perpetrator evidence entirely dependent upon the strength of the prosecution's evidence, considered in isolation. The Supreme Court found such a rule unconstitutional, in effect because it irrationally presumed that any evidence presented by the state was necessarily more credible than any evidence proffered by the defense.

2007 OK CR 19, ¶¶49–50, 159 P.3d at 288–289 (internal citations and footnotes omitted).

¶4 The Supreme Court in *Holmes* was dealing with a judge made rule that had no historical legal basis. In this case, the trial judge appropriately applied the Oklahoma Evidence Code, and prior case law, to determine that the proffered hearsay statements were not admissible as they did not fall under any recognized exceptions to the hearsay rule. There was no independent evidence to corroborate the statements and Johnson has no independent knowledge of what happened after he put out his alleged hit on the Vanns. In other words, he does not know who was at the Vann's house on the night of the murders. This opinion seeks to disregard the Rules of Evidence based on the sentence fragment "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'" that was contained in *Holmes,* 547 U.S. at 324, 126 S.Ct. at 1731.

¶5 The Evidence Code, both federal and state, have been developed through the cen-

1. 12 O.S.2001, § 2101 et seq.

turies and emanate from the English common law to ensure only competent evidence is presented in a court of law. Without regard to its validity or competency this opinion basically says that when it comes to what a defendant in a criminal case wants to present as part of his/her defense it must be admitted even though it violates our Evidence Code. Other than what he testifies he said, Johnson cannot under these rules testify to what other people told him when those statements do not qualify as exceptions to the hearsay rule. *See* 12 O.S.2001, § 2801 *et seq.* As Section 2802 sets out "[h]earsay is not admissible except as otherwise provided by an act of the Legislature." The U.S. Supreme Court decision in *Holmes* did nothing to dilute the application of the Rules of Evidence. The current decision seeks to do exactly what the U.S. Supreme Court condemned in *Holmes, i.e.* create an "arbitrary" rule. Regardless of whether an arbitrary rule benefits a defendant rather than the state, it is still arbitrary and inconsistent with the concept of the Rule of Law.

¶ 6 As the Supreme Court said in *Holmes:* While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. Plainly referring to rules of this type, we have stated that the Constitution permits judges "to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'"

547 U.S. at 326–27, 126 S.Ct. at 1732–33 (internal citations omitted).

¶ 7 The Supreme Court went on to say: A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged... ["][Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial". Such rules are widely accepted, and neither petitioner nor his *amici* challenge them here.

547 U.S. at 327, 126 S.Ct. at 1733 (internal citations omitted).

¶ 8 In a footnote listing jurisdictions which fall under this statement of acceptance of such rules the Supreme Court cited *Gore v. State,* 2005 OK CR 14, ¶¶ 13–24, 119 P.3d 1268, 1272–1276. *Id.*

¶ 9 The interesting thing about the cite to the particular pages of *Gore* is that those pages set out the lineage since the early days of statehood that Oklahoma has had those rules and consistently applied them. The opinion in the present case seeks to do what the precedent of this Court has not done, and that is nullify the requirement since statehood that "evidence must tend to connect such other person with the commission of the crime charged" and "[e]vidence, which can have no further effect than to cast a bare suspicion upon another is incompetent and inadmissible." *Gore,* 2005 OK CR 14, ¶ 13, 119 P.3d at 1273.

¶ 10 One year after *Gore,* Judge Lewis authored *Stouffer v. State,* 2006 OK CR 46, 147 P.3d 245. Addressing third party perpetrator evidence, and specifically the overt act requirement, this Court rejected Stouffer's claim of error in part because "[h]e had no evidence of an overt act by any particular person pointing to an alternative suspect". *Id.,* 2006 OK CR 46, ¶ 50, 147 P.3d at 262.

¶ 11 A year after *Stouffer,* Judge Charles Johnson authored *Pavatt v. State,* 2007 OK CR 19, 159 P.3d 272. In its discussion of third party perpetrator evidence, the overt act requirement simply is not mentioned. 2007 OK CR 19, ¶ 49, 159 P.3d at 288. Based on the votes in each of these cases, contrary to the statement in the current opinion, together with the long historical precedence of this Court on the issue, the overt act requirement is still a viable legal principle. Wishing something does not make it true.

¶ 12 Based on the principles set out in *Gore, Stouffer,* and *Pavatt* the trial court properly excluded Johnson's statements regarding what Campbell told him. There is no evidence of an overt act, and the evidence was not corroborated or trustworthy. While Johnson's testimony of what he himself had said or directed would not be barred by the Evidence Code as hearsay, the trial judge was confronted with an admitted perjurer. While I may have allowed that testimony, together with the collateral evidence regarding its untrustworthiness, I cannot say the trial court abused his discretion based on our case law and the Evidence Code. I would affirm the judgment and sentence.